# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
April 9, 2013

Lyle W. Cayce
Clerk

No. 12-20256

TIMEGATE STUDIOS, INCORPORATED,

Plaintiff-Appellee

v.

SOUTHPEAK INTERACTIVE, L.L.C.; GONE OFF DEEP, L.L.C., doing business as Gamecock Media Group; SOUTHPEAK INTERACTIVE CORPORATION; TERRY M. PHILLIPS,

Defendants-Appellants

v.

MELANIE MROZ,

Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, and DAVIS and CLEMENT, Circuit Judges.
W. EUGENE DAVIS, Circuit Judge:

Defendants-Appellants, who collectively operated as a video game publisher, entered into a contract with Plaintiff-Appellee, a video game developer, to produce and market a new video game. When their business relationship deteriorated, the parties proceeded with arbitration, and the arbitrator awarded the publisher Defendants-Appellants monetary compensation and a perpetual license in the video game's intellectual property.

No. 12-20256

However, the district court vacated the arbitrator's award, determining that the perpetual license was not consistent with the "essence" of the underlying contract. Because we find that the perpetual license was a remedy that furthered the essence of the publishing agreement, we REVERSE and REMAND with instructions to reinstate the arbitrator's award.

## I.

This dispute arises out of a video game publishing agreement ("the Agreement") entered into by Appellee Timegate Studios, Inc. ("Timegate") and Appellant Gone Off Deep, L.L.C. d/b/a Gamecock Media Group ("Gamecock") in June 2007.[1] Under the terms of the Agreement, Timegate was to be the developer and Gamecock was to be the publisher of a futuristic military-style video game entitled "Section 8." As developer, Timegate was obligated to design and develop a "high quality" video game in accordance with progress and expenditure milestones outlined in the Agreement. In contrast, Gamecock, as publisher, was obligated to provide most of the investment funding for the game's development. Gamecock was also primarily responsible for manufacturing, marketing, distributing, and selling the game after its development. Despite their distinct roles, the contract also contains numerous provisions requiring the parties to provide each other with specified resources, information, assistance, and consent.

The Agreement describes in detail the rights and duties of Timegate and Gamecock, including their rights with regard to Section 8 game sequels, add-ons, and licensing rights. The Agreement provides, in relevant part, that Gamecock shall have "the exclusive right and license" to "reproduce, manufacture, package,

---

[1] In October 2008, Gamecock was acquired by Southpeak Interactive, L.L.C. and organized as a wholly owned subsidiary of Southpeak Interactive Corporation (collectively "Southpeak"). Under a subsequent sublicense agreement with Gamecock, Southpeak assumed Gamecock's rights and responsibilities with regard to the Timegate publishing agreement. This opinion will refer to the publisher Defendants-Appellants as "Gamecock" throughout.

advertise, publish, market, sell to end-users, wholesalers, and retailers, distribute, . . . and display" Section 8 and any of its iterations on the game's initial platforms. Moreover, the Agreement also grants Gamecock the "limited exclusive right and license" to manufacture, market, publish, and sell add-ons and platform translations associated with Section 8. The Agreement, however, only grants Gamecock a worldwide license for a term of eight years following the game's first release or five years following the release of an add-on or sequel, whichever is later. A special provision concerning sequels guarantees Gamecock "the right of first refusal and last matching option for the publishing of one Sequel" to Section 8.

With regard to Section 8 intellectual property, the Agreement grants Gamecock "a non-exclusive right and license . . . to use the Game Trademarks[2] solely in connection with the packaging, sale, marketing, advertising and distribution" of the Section 8 game and any add-ons or sequels. However, the Agreement makes clear that Timegate will remain the "exclusive owner" of the game intellectual property and that Gamecock's use of such property is limited to reasonable game marketing, publishing, and distribution efforts.[3] Finally, the

---

[2] The Agreement defines "Game Trademarks" as the "trademarks, trade names, themes, characters, designs, likenesses and licenses for same used in connection with the Game, including but not limited to, Developer's trademark rights in the mark SECTION 8."

[3] The Agreement provides,

[T]he Developer [(Timegate)] is the exclusive owner of the Game Trademarks and all the goodwill attached thereto and that the Developer shall retain full rights to the Game Trademarks, all registrations granted thereon and the goodwill associated therewith. [Gamecock] shall also have the limited right to use the Game Trademarks in association with its own company marketing, provided that such use be reasonable and not misstate any affiliation with Developer or [Gamecock's] rights in the Game Trademarks. [Gamecock] shall have no rights, other than rights granted herein, to the Game Trademarks or any confusingly similar variation thereof.

Moreover,
Developer shall be the owner of all intellectual property rights in the Game,

No. 12-20256

Agreement specifically prohibits Gamecock from preparing derivative works or otherwise exploiting any Section 8 subject matter except in accordance with the contract.

Section 8 was finally released in September 2009, approximately two years after Timegate and Gamecock entered into the Agreement. By then, Gamecock had been acquired by Southpeak, which assumed Gamecock's rights and duties as publisher under the Agreement. Soon after, the parties' relationship began to deteriorate as sales of the game failed to meet expectations. In December 2009, Timegate filed suit against Gamecock, alleging multiple breaches of the Agreement: that Gamecock had become insolvent; that Gamecock's acquisition by and sublicense agreement with Southpeak was impermissible; and that Gamecock had misreported sales figures to Timegate. In response, Gamecock asserted that it was Timegate that breached the Agreement by unilaterally withdrawing from the contract, by failing to put forth its best efforts in developing the game, and by unilaterally publishing both a sequel and alternate platform of the game.

Gamecock also included in its answer a demand that the matter be stayed in the district court and submitted to binding arbitration in accordance with the arbitration clause in the Agreement. The district court stayed the suits pending the arbitration, which took place in April and July 2011. In the arbitration,

Game Trademarks, Derivative Works and all Deliverables (including without limitation, merchandising items, logos, etc.) related thereto created or developed by or on behalf of Developer, including without limitation, all copyrights, trademarks, patents, trade secrets, and other proprietary rights.

. . . .

During the Term, Developer grants to [Gamecock] the non-exclusive right to publicly Use all of Developer's intellectual property rights in the Game (and for Ports, Add-Ons and Sequels) and the Deliverables related thereto, including, without limitation, all of Developer's patents, copyrights, and trademarks, in connection with the publication, distribution, marketing, promotion, and advertising of the Game and/or the Deliverables related thereto, as provided in the licenses granted in this Agreement.

4

No. 12-20256

Timegate sought recovery for breach of contract, quantum meruit, and copyright infringement. In turn, Gamecock sought recovery for breach of contract and fraud. Gamecock asserted that Timegate never intended to fully develop Section 8, and that Timegate had made material misrepresentations in order to induce Gamecock to enter the Agreement.

Following an eight-day evidentiary hearing, the arbitrator issued his Final Award, Findings of Fact, and Conclusions of Law (the "Award"), in which he rejected Timegate's claims and ruled in favor of Gamecock's counterclaims for breach of contract and fraud. The arbitrator found that Timegate had actively engaged in a litany of fraudulent misrepresentations and contractual breaches. Specifically, the arbitrator found that of the $7.5 million Gamecock supplied to Timegate and which Timegate was obligated to spend on Section 8's development, Timegate had spent only $6.76 million while pocketing the balance. Moreover, Timegate failed to spend *any* of the $2.5 million of its own money that it was obligated to spend on Section 8's development. According to the arbitrator's findings of fact, "TimeGate never intended to invest $2.5 million of its own money" and "failed to use its best efforts to develop a high quality Game" in accordance with the Agreement. As a result, the arbitrator found that "Timegate induced Gamecock to enter into the Publishing Agreement by fraud, and induced [Southpeak] to continue to honor the Publishing Agreement by fraud, as it promised to invest $2.5 million . . . without intending to do so, and Gamecock and [Southpeak] relied upon such promise to their detriment." Concluding that Timegate materially breached the Agreement, the arbitrator awarded Gamecock $7,349,733.57, which he determined was the cash loss suffered by Gamecock to date.[4]

---

[4] The arbitrator also awarded Gamecock $831,479.55 in attorney's fees for legal costs incurred through the arbitration.

No. 12-20256

The arbitrator also found, however, that the monetary award for losses to date failed to fully compensate Gamecock for all of Timegate's fraud and contractual breaches. For example, the arbitrator concluded that Timegate breached the Agreement by (1) self-publishing the Playstation 3 platform translation, or "port", of Section 8 and (2) unilaterally developing a game sequel in direct violation of its licensing agreement with Gamecock. Timegate further breached the agreement by (3) failing to provide Gamecock with fully functioning versions of Section 8 downloadable content, (4) failing to provide a Russian translation of the game, and (5) failing to provide Gamecock with the necessary access codes corresponding to Gamecock's exclusive right to distribute the game electronically via certain third-party websites.[5] Each of these breaches deprived Gamecock of the opportunity to exploit the potential opportunities offered by other iterations, distribution channels, and sequels of Section 8. Thus, the arbitrator determined that in addition to the $7.35 million award,

> The Publishing Agreement is hereby amended as a matter of law that Gamecock and [Southpeak] have a perpetual license for TimeGate's intellectual property in the Game, and Gamecock and [Southpeak] have no obligation to report to TimeGate about sales of the Game that use any of TimeGate's intellectual property, nor do Gamecock and [Southpeak] have any legal obligation to pay any royalties to TimeGate under the Publishing Agreement, and Gamecock and [Southpeak] may create Sequels, Ports, Add-Ons related to the Game.

> The Publishing Agreement is hereby amended as a matter of law that TimeGate may create sequels, Ports, Add-Ons related to the Game, or other competing products, and . . . TimeGate has no legal duty to pay any royalties to Gamecock or [Southpeak] related to the Game.

---

[5] We emphasize that as Timegate's counsel conceded at oral argument, this Court is bound by the arbitrator's unchallenged factual determinations.

No. 12-20256

The Publishing Agreement is hereby amended as a matter of law that Gamecock or [Southpeak] may create sequels, Ports, Add-Ons related to the Game, or other competing products, and . . . neither Gamecock nor [Southpeak] has no [sic] legal duty to pay any royalties to TimeGate related to the Game.

The effect of the license-modifying portion of the Award was to realign major elements of the parties' future relationship as established by their original agreement. The parties' initially-distinct roles as developer and publisher were effectively dissolved with each party being given the right to unilaterally create derivative Section 8 merchandise and property. Timegate and Gamecock's previous obligations to report, share, and distribute revenues from Section 8 were likewise dissolved, permitting each party to pursue Section 8 commercial activities independently.

Gamecock moved the district court to confirm the arbitration Award. Timegate objected, and asked the court to vacate the Award because the arbitrator exceeded his authority. The district court found that although a finding of fraud permits an arbitrator to fashion an award which conflicts with contractual provisions, any such award must still be "rationally inferable from the parties' central purpose in drafting the agreement." The court then concluded that the arbitrator's creation of the perpetual license was not a remedy rationally rooted in the contract. Because "[t]he provision takes what was a temporary licensing agreement, which required collaboration and coordination between the parties, and expands it into a permanent contract under which the parties are able to develop competing products," the court found that the grant of a perpetual license exceeded the arbitrator's authority. In the district court's view, the perpetual license was "inconsistent with the fundamental purpose of the contract."[6] Because the district court concluded that

---

[6] Timegate also argued to the district court that the arbitrator exceeded his authority by awarding cash damages based on milestone payments which the Agreement described as

7

No. 12-20256

it could "not modify the award while still preserving its intent, and acting consistently with the essence of the parties' contract," the court vacated the entire Award. Gamecock now appeals.

## II.

Our review of the district court's confirmation or vacatur of an arbitrator's award is de novo. *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1320 (5th Cir. 1994). "Our review of the arbitrator's award itself, however, is very deferential. We must sustain an arbitration award even if we disagree with the arbitrator's interpretation of the underlying contract as long as the arbitrator's decision 'draws its essence' from the contract." *Id.* (citation omitted) (quoting *Anderman/Smith Operating Co. v. Tenn. Gas Pipeline Co.*, 918 F.2d 1215, 1218 (5th Cir. 1990)). "In other words, we must affirm the arbitrator's decision if it is rationally inferable from the letter or the purpose of the underlying agreement." *Id.* "In deciding whether the arbitrator exceeded its authority, we resolve all doubts in favor of arbitration." *Id.*

## III.

Gamecock first argues that the district court erred by vacating the arbitration Award. Contrary to the district court's conclusion, Gamecock contends that the perpetual license remedy selected by the arbitrator was permissible and rationally explainable as a logical means of furthering the aims of the underlying publishing agreement.

The Federal Arbitration Act provides, in relevant part, that a district court may vacate an arbitration award "where the arbitrators exceeded their powers."[7]

---

non-refundable. Unlike the perpetual license, the district court found that the cash award voided any conflicting contractual provisions related to the damages award in light of Timegate's fraudulent inducement. Timegate has not disputed this finding on appeal.

[7] The Federal Arbitration Act actually provides four bases upon which a district court may vacate an arbitrator's award: (1) "where the award was procured by corruption, fraud, or undue means;" (2) "where there was evident partiality or corruption in the arbitrators;" (3)

No. 12-20256

9 U.S.C. § 10(a)(4). Whether an arbitrator has exceeded his powers is tied closely to the applicable standard of review. We will sustain an arbitration award as long as the arbitrator's decision "draws its essence" from the contract—even if we disagree with the arbitrator's interpretation of the contract. *Executone*, 26 F.3d at 1320.[8] The question is whether the arbitrator's award "was so unfounded in reason and fact, so unconnected with the wording and purpose of the [contract] as to 'manifest an infidelity to the obligation of an arbitrator.'"[9] Thus, the substantive question of whether an arbitrator has exceeded his arbitration powers is a function of our highly deferential standard of review in such cases: an arbitrator has not exceeded his powers unless he has utterly contorted the evident purpose and intent of the parties—the "essence" of the contract.

In this case, the arbitration clause is quite broad and contains no limits relevant to the instant dispute: "*any* dispute . . . shall be submitted to binding arbitration."   (emphasis added). Moreover, "the arbitrator's selection of a particular remedy is given even more deference than his reading of the underlying contract." *Executone*, 26 F.3d at 1325. "The remedy lies beyond the arbitrator's jurisdiction only if 'there is no rational way to explain the remedy

"where the arbitrators were guilty of misconduct . . . or of any other misbehavior by which the rights of any party have been prejudiced;" and (4) "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a). The only grounds asserted for vacatur in the instant case is that the arbitrator exceeded his powers

[8] *See also Misco*, 484 U.S. at 38 ("[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.").

[9] *Brotherhood of R.R. Trainmen v. Cent. of Ga. Ry.*, 415 F.2d 403, 412 (5th Cir.1969) (quoting *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960))*, cert. denied*, 396 U.S. 1008 (1970).

No. 12-20256

handed down by the arbitrator as a logical means of furthering the aims of the contract.'" *Id*.[10]

Because the question of an arbitrator's remedial power hinges upon the "aims," "wording and purpose," and "essence" of the underlying agreement, we must first determine the essence of the publishing agreement in the instant case. According to the Agreement, the parties' contract was motivated by Gamecock's "desire[] to engage [Timegate] to develop an interactive video game with a working title of Section 8." The numerous contractual provisions that follow describe in detail how funding is to be allocated to the game's development, which party is to provide what funding, how developmental benchmarks are to be determined, and the respective roles of the parties in the design and creation of the game. Other provisions describe the respective roles of the parties in the marketing of the game, with each party being subject to record-keeping and reporting requirements. The Agreement further outlines various financial provisions detailing how revenue, expenses, and profits are to be calculated and allocated. In fact, virtually every foreseeable aspect of the parties' business relationship is contemplated and addressed by the Agreement, representing a sensitive, interdependent balance in which each party was assured of a specific set of rights and benefits in exchange for their promise to accept a specific set of duties and responsibilities. The entire Agreement can accurately be summed up as the creation of a mutually beneficial business relationship between two parties with distinct expertise: a video game developer and a video game publisher. The parties were to work jointly to create, market, and popularize a video game whose success would yield financial benefits to be distributed

---

[10] (quoting *Brotherhood of R.R. Trainmen*, 415 F.2d at 412). *See also Anderman/Smith Operating Co. v. Tenn. Gas Pipeline Co.*, 918 F.2d 1215, 1219 n.3 (5th Cir. 1990) ("The single question is whether the award, however arrived at, is rationally inferable from the contract.").

between the two parties in accordance with their respective contributions to the joint effort as required by the contract.

The perpetual license furthers these general aims of the Agreement. As Timegate's counsel conceded at oral argument, we are bound by the arbitrator's factual findings regarding Timegate's conduct—findings which identify Timegate's pattern of deliberate fraud, deception, and willingness to violate its promises. Timegate had breached the Agreement in so many ways and its relationship with Gamecock had become so contentious that the collaborative relationship presupposed by the Agreement was no longer possible. The perpetual license granted to Gamecock represents an attempt by the arbitrator to restore to Timegate and Gamecock the fundamental goal of the Agreement: mutual access to financial benefits derived from their joint creation and distribution of Section 8.

As the arbitrator recognized, the parties were unable to work together in a cooperative effort to profit from this venture because of Timegate's numerous breaches. An adequate remedy in the form of a monetary award was available for Timegate's breaches to date; however, whether sequels or other iterations of Section 8 would or could be developed successfully and marketed profitably (particularly estimates of the amount of such profit) was so speculative that the arbitrator rationally could have concluded that a monetary award was not an appropriate remedy for those breaches. Under these circumstances, where the relationship of the parties could not be expected to be healed primarily because of the fraud of Timegate, the parties could no longer partner together to market their product jointly. The only way to give Gamecock the opportunity to benefit from the future development of variations of Section 8 was to cut Gamecock loose from Timegate and allow it to independently pursue game marketing efforts. To do this, the arbitrator granted the perpetual license to Gamecock, a remedy that also left Timegate free to develop and promote Section 8 variations on its own.

No. 12-20256

We conclude that the arbitrator could have reasonably found that only by severing the parties' obligations to work with each other to develop, publish, and sell Section 8 could each party achieve the object of the Agreement: access to the financial benefits of their agreed-upon contributions. In fact, one provision in the contract actually provides that in the event of certain (inapplicable) breaches of the Agreement by Timegate, Timegate "shall deliver to [Gamecock] all Work Product and other materials requested or required by [Gamecock] . . . including, but not limited to, the Intellectual Property."[11] Indeed, when questioned at oral argument, Timegate's counsel could offer no alternative remedy to permanently and fairly compensate Gamecock for Timegate's contractual breaches, given the findings of the arbitrator. This supports our conclusion that the Award was a permissible exercise of the arbitrator's creative remedial powers.[12]

In response, Timegate argues that the essence of the Agreement should not be construed so generally. As Timegate correctly observes, "It is well-established that courts may set aside awards when the arbitrator exceeds his contractual mandate by acting contrary to express contractual provisions."[13]

---

[11] Indeed, it appears that in the traditional "pay for hire" arrangement in the video game industry, a publisher incrementally pays a developer for all of the costs of developing a video game, and in turn the *publisher* retains the intellectual property rights to "elements such as the game's name, characters, storyline, and logos." *See* Jennifer Stanley, DEAL POINTS IN GAMING NEGOTIATION, 11 No. 1 CYBERSPACE LAW. 4 (2006).

[12] In a separate attempt to sustain the district court's vacatur of the Award, Timegate asserts that the perpetual license cannot be upheld because it would eliminate Timegate's ability to control its trademark in Section 8, creating a "naked license" and effectively destroying the trademark. However, Timegate's objection is merely one more consideration which factors into this Court's essence analysis. Contrary to Timegate's assertions, the mere possibility of a watered-down trademark is a natural consequence of shared licensing rights—rights already contemplated by the Agreement—and in this case does not interfere with the Agreement's essence.

[13] *Beaird Indus., Inc. v. Local 2297, Int'l Union*, 404 F.3d 942, 946 (5th Cir. 2005); *see also Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n*, 889 F.2d 599, 604 (5th Cir. 1989) (stating that "arbitral action contrary to express contractual provisions will not be respected").

Accordingly, Timegate argues that the perpetual license remedy cannot further the essence of the Agreement when it conflicts with specific provisions in the Agreement governing the retention and limitation of intellectual property rights.

However, Timegate's reliance upon these conflicting provisions to invalidate the Award is misleading for several reasons. First, Timegate ignores the extremely particularized nature of its Agreement with Gamecock. The 35-page contract contains hundreds of individual provisions governing every foreseeable aspect of the parties' relationship. Any award which attempts to compensate and restore one contractual party for multiple, irreversible breaches committed by the other party will inevitably realign some of the original contract's provisions. If the "essence" of such a complex contract rested on every provision in the contract, an arbitrator could not possibly fashion a remedy.[14]

Second, it is undisputed that under Texas law, a finding of fraudulent inducement can provide an arbitrator with a basis for voiding provisions of a contract.[15] Nor has Timegate challenged the district court's conclusion that the arbitrator can *implicitly* void contractual provisions in a fraudulently induced contract merely by ordering an award which partially conflicts with the contract. *See Executone*, 26 F.3d at 1325.[16] Thus, the arbitrator's finding of fraudulent inducement permitted him to fashion an award which conflicted with provisions in the original Agreement.

---

[14] *See Executone*, 26 F.3d at 1327–28 (broadly defining "the parties' central purpose in drafting the agreement—which was to reach a purchase price based on a fair calculation of [the distributor's] adjusted pre-tax profits for the year").

[15] *See, e.g., Dunbar Med. Sys., Inc. v. Gammex Inc.*, 216 F.3d 441, 454 (5th Cir. 2000) (affirming award of punitive damages under Texas law to party fraudulently induced into entering contract, despite contractual provision excluding punitive damages).

[16] "We are not limited to the arbitrator's explanations for his award; as we stated in *Anderman/Smith*, 'this Court does not review the language used by, or the reasoning of, the arbitrators in determining whether their award draws its essence from the contract. This Court looks only to the result reached.'" *Executone*, 26 F.3d at 1325 (quoting *Anderman/Smith*, 918 F.2d at 1219 n.3).

No. 12-20256

Third, the cases which Timegate cites do not stand for the proposition that an arbitration award can never alter a provision of the underlying contract. Rather, "in the cases in which we [have] found an arbitrator had exceeded his powers, he had intruded on an issue that was reserved for an alternative decisionmaker or was removed from anyone's discretion under the contract." *Apache Bohai Corp. LDC v. Texaco China BV*, 480 F.3d 397, 403–04 (5th Cir. 2007).[17] The contested intellectual property licensing provisions in the Award do not concern an issue precluded from arbitration, nor does the Agreement purport to vest discretion over such matters in some other party or entity.

Although this court has not considered a factually similar application of the essence test, our caselaw suggests that the perpetual license is within the broad scope of the arbitrator's authority. In *United Steelworkers v. U.S. Gypsum*,

---

[17] For example, Timegate cites *Beaird v. Local 2297* for the proposition that "courts may set aside awards when the arbitrator exceeds his contractual mandate by acting contrary to express contractual provisions." 404 F.3d at 946. In *Beaird*, an arbitrator determined that an employer had violated its collective bargaining agreement by subcontracting its landscaping work to a third party. *Id.* at 945. However, the agreement specifically provided that the employer would retain the right to "exercise within its sole and exclusive discretion . . . the decision to subcontract out [landscaping] work." *Id.* As a result, this court found that the unambiguous language of the contract gave the employer an unlimited right to subcontract, and the arbitrator could not determine that the employer had breached the contract by subcontracting. *Id.* at 945–46. Timegate also cites *Delta Queen* for its similar holding. 889 F.2d at 604. In *Delta Queen*, a collective bargaining agreement similarly vested sole responsibility and discretion for disciplinary action in the company's management once proper cause for discipline was found to exist. *Id.* This court found that because the arbitrator had found the existence of proper cause for discipline, the agreement prohibited him from questioning management's disciplinary actions. *Id.*

Each of these cases involved contractual provisions which limited the arbitrator's own authority and which the arbitrator had completely disregarded. In contrast, the instant case concerns an arbitrator's discretionary attempt to restore the party's rights following what was indisputably a contractual breach and proper invocation of the arbitrator's remedial powers. *See United Steelworkers of America v. U.S. Gypsum Co.*, 492 F.2d 713, 730 (5th Cir. 1974) ("Provided that his choice is not precluded by *the arbitration provision under which he was acting*, is adequately grounded in the contract, and is not arbitrary or capricious, we must uphold his action." (emphasis added)). Moreover, each of the cases cited by Timegate is distinguishable on the sole ground that they did not concern situations in which fraud has made the underlying contract voidable.

14

this court considered the propriety of an arbitrator's award in the context of a dispute between union workers and their employer who had refused to negotiate wages with them five years before the arbitration. 492 F.2d at 728. To compensate the employees, the arbitrator ordered the employer to pay "the amount of a wage increase which he thought the parties would have agreed to had they negotiated." *Id*. Although this remedy is inherently speculative and called for the arbitrator to unilaterally realign the contractual balance of the parties, this court upheld the award. *Id*. We reasoned,

[W]e do not consider the arbitrator's remedy as making an agreement for the parties or as adding terms to the contract. In the context present here his action merely represents an attempt to make the union whole for the damage suffered as a result of Gypsum's breach of the collective bargaining agreement. Having deprived the union of its right to negotiate over an increase in wages, the company is bound by the arbitrator's determination that it must remedy this wrong. Nothing in the agreement precludes the remedy selected by the arbitrator.

*Id*. at 730–31. We concluded: "Provided that his choice is not precluded by *the arbitration provision under which he was acting*, is adequately grounded in the contract, and is not arbitrary or capricious, we must uphold his action." *Id*. at 730 (emphasis added).[18]

The only case we have found which considers facts similar to the instant case was decided by the California Supreme Court in *Advanced Micro Devices,*

---

[18] *See also Amalgamated Transit Union Local No. 1498 v. Jefferson Partners*, 229 F.3d 1198, 1201 (8th Cir. 2000). The *Jefferson* case concerned an employer which maintained a seniority-based wage tier system, which guaranteed senior employees greater pay. *Id*. at 1199. The employee's union sued the employer when it unilaterally enacted wage increases which elevated all employee pay to what had previously been the highest wage tier. *Id*. Upholding the arbitrator's decision to impose new tiered wage increases, the Eighth Circuit concluded: "It is true that the remedy . . . is not expressly provided for in the agreement. But contracts often lack explicit provisions for specific kinds of remedies. The company's breach (which it does not now dispute) had already disturbed the contractual wage scale. The arbitrator's choice of remedy is one way to restore the balance. Nothing in the contract prohibits this choice." *Id*. at 1201.

*Inc. v. Intel Corp.*, 885 P.2d 994 (Cal. 1994). In that case, AMD and Intel, two computer-chip manufacturers, entered into a joint chip development and manufacturing agreement, the exact nature of which was disputed. *Id.* at 996–98. When AMD became aware of Intel's detrimental unilateral development and outsourcing activities involving chip efforts which were supposed to be collaborative, the parties entered arbitration. *Id.* at 998. Finding a breach of Intel's warranty of good faith, and concluding that AMD's damages were inherently "immeasurable," the arbitrator awarded AMD monetary damages and a "permanent, nonexclusive and royalty-free license to any Intel intellectual property embodied in the [chip in question]." *Id.* at 998–99. Applying California's identical standard for reviewing arbitration awards, the California Supreme Court considered whether the arbitrator had "exceeded [his] powers." *Id.* at 1006–09. Rejecting Intel's argument that "arbitrators may not award a party benefits different from those the party could have acquired through performance of the contract," the court concluded that the permanent license remedy was "rationally drawn from the arbitrator's conception of the contract's subject matter and the effects on AMD of Intel's breach." *Id.* at 1006–08. We find the reasoning of the *AMD* court persuasive and agree with its analysis.

Based on the above caselaw and reasoning, we conclude that the Section 8 perpetual license is rationally rooted in the Agreement's essence. Timegate committed an extraordinary breach of the Agreement, and an equally extraordinary realignment of the parties' original rights is necessary to *preserve* the essence of the Agreement. Because the Agreement bestowed broad remedial powers upon the arbitrator and because it was fraudulently induced and irreversibly violated by Timegate, the perpetual license is a rational and

No. 12-20256

permissible attempt to compensate Gamecock and maintain the Agreement's essence.[19]

## IV.

For the reasons stated above, the judgment of the district court is REVERSED and REMANDED with instructions to confirm the arbitration award.

---

[19] Timegate also briefly argues that the Award's perpetual license renders other provisions of the Agreement "nonsensical," because it is unclear whether they have survived in light of the Award. (For example, Timegate points to the contract's requirement that Gamecock include Timegate's name and logo on Section 8 packaging and advertising.) However, Timegate's argument is meritless because the Award makes clear that the Agreement "remains in full force and effect as amended by this Award." Thus, any provisions of the Agreement which are not impliedly voided because of a conflict with the Award's amendments remain active.