# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 10, 2021

Lyle W. Cayce
Clerk

No. 20-60347

Northrop Grumman Ship Systems, Incorporated, *formerly known as* Ingalls Shipbuilding, Incorporated,

*Plaintiff—Appellee*,

*versus*

The Ministry of Defense of the Republic of Venezuela,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:02-CV-785

Before Haynes, Duncan, and Engelhardt, *Circuit Judges*.

Per Curiam:*

A little over a year before Hugo Chávez came to power in Venezuela, Huntington Ingalls Incorporated ("Huntington Ingalls," formerly known both as Northrop Grumman Ship Systems, Inc. and as Ingalls Shipbuilding, Inc.), a U.S.-based defense contractor, agreed to refurbish two warships for

---

\* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

the Ministry of Defense of the Republic of Venezuela (the "Ministry"). A couple of years later—after Chávez became president of Venezuela at the head of the "Bolivarian Revolution"—Huntington Ingalls sought to arbitrate a cost overrun dispute with the Ministry.

Although the parties' contract designated Venezuela as the exclusive arbitral forum, the district court ordered arbitration outside that country, determining that arbitration in Venezuela would be impracticable given the likelihood that the hostile political environment in the country would make Venezuelan courts unfairly side with the Ministry in any related disputes. Following the district court's impracticability determination, the arbitration tribunal eventually moved the arbitration to Brazil, where it awarded Huntington Ingalls over $128 million. The district court then enforced the arbitral award and entered judgment in Huntington Ingalls's favor, concluding that the tribunal had not manifestly disregarded the parties' agreement or the law. For the following reasons, we AFFIRM.

## I. Background

In 1997, Huntington Ingalls entered into a $315 million contract with the Ministry to repair two Venezuelan Navy frigates—ARV *Mariscal Sucre* and ARV *Almirante Brion*—at Huntington Ingalls's shipyard in Pascagoula, Mississippi. Among other provisions, the parties' contract contained a mandatory arbitration provision specifying Caracas, Venezuela as the exclusive arbitral forum: per the English translation of the contract, "Arbitration actions shall take place in Caracas, Venezuela."

In 2002, the parties encountered substantial disagreement over cost overruns. Unable to get the Ministry to pay for certain work, Huntington Ingalls filed suit in the Southern District of Mississippi, seeking damages, injunctive relief, and to compel arbitration. The Ministry failed to appear, and the district court clerk entered a default.

No. 20-60347

After the entry of default, Huntington Ingalls renewed its motion to compel the Ministry to arbitrate the dispute—but requested that the district court order arbitration in Mississippi instead of Venezuela. Alongside its request, Huntington Ingalls submitted two declarations indicating that arbitration in Venezuela would be difficult in light of the political control the Venezuelan government exerted over its courts in the wake of Chávez's "Bolivarian Revolution" of 1999.

First, Keith Rosenn, an American law professor, opined that various revolutionary "reforms" had led to the government "summarily sacking judges" and stocking the bench with provisionally appointed (and politically dependent) replacements. The effect was widespread: in 2000, Rosenn indicated, 64.7% of Caracas's appellate judges, 66.1% of Caracas's first instance judges, and 87.6% of Caracas's municipal judges were provisionally appointed, as were over 90% of all judges nationwide. Such a structure, Rosenn opined, left the Venezuelan judiciary subject to "political pressure and influence from the Chávez Government" and created an "unreasonably high risk of not securing a fair and independent judge" in the country—especially because the Ministry itself is "enormously powerful" in Venezuela.

Second, Manuel Gomez, a Venezuelan lawyer and law professor, opined that the Venezuelan government exerted various forms of undue influence on the Venezuelan judiciary. Venezuelan judges, Gomez indicated, were frequently unable to enforce rulings that conflicted with the interests of the government. Indeed, judges were often met by violence instigated by government officials: Gomez identified that one judge had been shot and killed while enforcing an eviction order one day after Chávez encouraged his followers to "resist any judicial orders that would affect their rights." The political pressure extended to non-court proceedings, as well: Gomez opined

that, in addition to its control of the judiciary, the Venezuelan government also exerted "prompt and direct influence" over arbitrations in the country.

The district court, apparently crediting Rosenn's and Gomez's declarations, granted Huntington Ingalls's motion and ordered arbitration in Mississippi on the grounds that the "violently unstable political situation in Venezuela has rendered that country an unsuitable forum at this time." The designated arbitral tribunal, in turn, moved the proceedings to Mexico City, Mexico "to ensure the greatest equality between the parties."

Before those arbitration proceedings were completed, however, the Ministry filed an appearance in the district court and moved to vacate the arbitration order or, alternatively, to stay the arbitration. The district court agreed to the latter, staying the arbitration until it could consider the merits of the Ministry's other requests.[1] Before the district court ruled on any other motions, the Ministry's counsel offered Huntington Ingalls $70 million to settle the case, which Huntington Ingalls accepted. As a result, the district court entered an order dismissing the case with prejudice. But the Ministry had not actually authorized its counsel to enter into a settlement—merely to negotiate one. Accordingly, the Ministry retained new counsel and moved to vacate the district court's dismissal order. The district court denied the Ministry's motion and enforced the settlement agreement.

The Ministry appealed, challenging both the district court's decision to enforce the settlement agreement and the district court's earlier refusal to compel arbitration in Venezuela. *See Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of the Republic of Venez.* (*Northrop Grumman I*), 575 F.3d 491, 496, 502 (5th Cir. 2009). We agreed with the Ministry as to the settlement

---

[1] The Mexico City arbitration proceedings eventually terminated without a decision in 2008.

agreement and reversed the district court's dismissal order. *Id.* at 502. But we could not definitively resolve the arbitration question—it had become moot when the ordered arbitration proceedings had terminated without decision. *Id.* Rather than decide where arbitration should occur in the first instance, we remanded to the district court to analyze whether "present conditions" would make it impracticable to arbitrate in Venezuela, the contract's designated arbitral forum. *Id.* at 502–03. We gave the district court very specific instructions for that analysis: to avoid arbitrating in Venezuela, we emphasized, Huntington Ingalls would have to show that conditions in the country made arbitration there impracticable in a way that was unforeseeable when the parties entered into the contract. *Id.* at 503. We did not direct the district court to consider any other factors. *Id.*

On remand, the district court dutifully conducted the impracticability analysis we directed. *See Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of the Republic of Venez.*, No. 1:02cv785, 2010 WL 5058645, at *1 (S.D. Miss. Dec. 4, 2010). In those proceedings, Huntington Ingalls both referred to Rosenn's and Gomez's earlier declarations and submitted additional declarations further indicating that the political situation in Venezuela would unduly affect the arbitral proceedings. The new declarations focused on the Venezuelan government's unwillingness to enforce arbitral awards against government entities, as well as the unforeseeability of such conditions at the time the parties entered their contract in 1997.

Gomez, supplementing his earlier declaration, maintained that any arbitration proceedings brought by a U.S.-based party against a Venezuelan government entity would "meet enormous resistance and face significant obstacles." That resistance, Gomez stated, was unforeseeable when the parties entered into the contract in 1997 because the "Bolivarian Revolution" made the judiciary "an instrument subject to the [government's] political agenda."

No. 20-60347

Similarly, Antonio Canova Gonzalez, a Venezuelan lawyer and law professor, opined that an arbitration involving these parties would be subject to significant political pressure by the Political-Administrative Chamber of the Venezuelan Supreme Tribunal of Justice. In particular, Canova Gonzalez opined that, "without a shadow of doubt," that court would reject any attempt to enforce an arbitral award against the Ministry because: the revolutionary government had systematically replaced judges on that court; that court overwhelmingly decided in favor of the Venezuelan government in suits brought by private parties; and that court had, in the previous two years, not found in a private party's favor in any of the 89 contractual cases seeking monetary damages brought against the Venezuelan government.[2]

Finally, Jose Eloy Anzola, a Venezuelan lawyer and law professor, likewise opined that, based on his survey of post-1999 decisions of the Political-Administrative Chamber, the court was likely to intervene in arbitral proceedings in this case in a way that would "seriously disrupt[]" the arbitration.

Huntington Ingalls further drew the district court's attention to a particular decision by the Political-Administrative Chamber that effectively froze over $350 million of another foreign defense contractor's assets in connection with an arbitration on a $2 million contract.[3]

---

[2] In his supplemental declaration, Canova Gonzalez noted that the court was substantially more even-handed before the revolution: in 1989, that court granted 20 of the 40 private party requests for review of contentious administrative matters and decided in favor of private parties in two of the three cases seeking to impose financial liability on the government.

[3] Huntington Ingalls additionally argued that American law prevented it from presenting critical evidence in Venezuela—specifically, that the parties' dispute involved technical data that it would be barred from bringing to Venezuela by the Arms Export Control Act, 22 U.S.C. §§ 2751–2799aa–2, and the International Traffic in Arms Regulations, 22 C.F.R. §§ 120.1–130.17. Those limitations, Huntington Ingalls claimed,

No. 20-60347

In response, the Ministry offered declarations of Venezuelan government officials and lawyers, who opined that Huntington Ingalls would not face any difficulties arbitrating in Venezuela because no government officials had been prosecuted for attempting to influence an arbitration; the Venezuelan government generally agrees to pay arbitral awards; and that the Venezuelan government generally supports arbitration and would not try to politically interfere in any proceedings.

Considering this evidence, the district court concluded that arbitration in Venezuela would be impracticable in a way that was unforeseeable to Huntington Ingalls at the time the contract was signed: the new political situation in the country would essentially deprive Huntington Ingalls of its day in court if forced to arbitrate there. *See Northrop Grumman*, 2010 WL 5058645, at *4. The district court then gave the parties an opportunity to agree on an alternate arbitral forum. *Id.* at *5. The parties subsequently informed the district court that they agreed to arbitration in Washington, D.C.[4]

Unsatisfied with the district court's decision to again compel arbitration outside of Venezuela, the Ministry appealed, which we dismissed for lack of jurisdiction. *Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of the Republic of Venez.* (*Northrop Grumman II*), No. 11-60001, slip op. (5th Cir. Mar. 23, 2011) (per curiam). The Ministry also sought mandamus relief,

---

were also unforeseeable at the time the contract was signed: although Huntington Ingalls had the relevant authorizations to share that data with the (pre-revolution) Ministry in the 1990s, the United States had since revoked all licenses to share defense information with Venezuela. *See* Bureau of Political-Military Affairs: Revocation of Defense Export Licenses to Venezuela, 71 Fed. Reg. 47,554 (Aug. 17, 2006) (codified at 22 C.F.R. § 126.1(d)(1)) (limiting export of "defense articles and defense services" to Venezuela).

[4] The Ministry maintains that it only agreed to arbitration in D.C. "under protest."

which we similarly denied.  *See In re Ministry of Def. of the Republic of Venez.* (*Northrop Grumman III*), 430 F. App'x 271 (5th Cir. 2011) (per curiam).

As directed by the district court, arbitration proceedings began in Washington, D.C.  But the Ministry still wanted arbitration to be in Venezuela: it objected to holding the proceedings in Washington and once again requested that the arbitration be moved to Caracas.  The arbitral tribunal denied the Ministry's request, concluding that it was precluded from ordering arbitration in Caracas by the district court's impracticability ruling and that, in any event, the parties had (at least temporarily) agreed to Washington as a new arbitral forum.  The tribunal then reasoned that the Ministry's reneging on arbitrating in Washington had effectively eliminated any agreement as to arbitral forum.  Therefore, the tribunal reasoned, Venezuelan law authorized it to designate a new arbitral forum—a power it exercised by moving the arbitration to Rio de Janeiro, Brazil.

Eventually, after a seven-day hearing and numerous rounds of briefing, the tribunal awarded Huntington Ingalls over $128 million in compensation, pre-award interest, and costs.  Huntington Ingalls moved to enforce that award in the Southern District of Mississippi.[5]  The district court granted Huntington Ingalls's motion, rejecting the Ministry's arguments that the court had erred in ordering arbitration outside of Venezuela, as well as its arguments that the tribunal had, in turn, erred by moving the arbitration to Brazil. *Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of the Republic of Venez.*, No. 1:02cv785, 2020 WL 1584378, at *6–7 (S.D. Miss. Mar. 31, 2020).  The Ministry timely appealed.

---

[5] Huntington Ingalls first tried to enforce the award in the District of the District of Columbia, but that court dismissed Huntington Ingalls's motion in light of the Southern District of Mississippi's continuing jurisdiction over the case.

No. 20-60347

## II.   Jurisdiction & Standard of Review

The district court had subject-matter jurisdiction under 28 U.S.C. § 1330(a) and § 1605(a)(2) as an action against a foreign state engaging in commercial activity in the United States. *See Northrop Grumman I*, 575 F.3d at 494 n.1 (noting that the court had jurisdiction under the commercial activity exception to the Foreign Sovereign Immunities Act). The court also had subject-matter jurisdiction under the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 203, 302, which codifies the Inter-American Convention on International Commercial Arbitration (the "Panama Convention").[6]     Organization of American States, Inter-American Convention on International Commercial Arbitration, Jan. 30, 1975, O.A.S.T.S. No. 42, 1438 U.N.T.S. 249. We have jurisdiction to review the district court's final judgment under 28 U.S.C. § 1291.

We review de novo a district court's ruling on a motion to compel arbitration. *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 337 (5th Cir. 2004). In that analysis, we defer to the district court's underlying factual findings and will not disturb them unless they are clearly erroneous.

---

[6] The Panama Convention generally governs international arbitrations in the Americas. *See* 9 U.S.C. § 305(1) (applying the Panama Convention when a majority of parties are citizens of member states of the Organization of American States signatory to the Convention); *see generally* Panama Convention art. 1, 1438 U.N.T.S. at 249 (treating arbitration agreements as generally valid); *id.* at 250 (allowing ratification of the Convention by all members of the Organization of American States).

The Panama Convention is broadly similar to the New York Convention, which governs most other international arbitrations. *See* United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38; *see also* 9 U.S.C. § 305(2). In particular, the Panama Convention and New York Convention have "substantively identical" provisions regarding the enforcement of arbitral awards. *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 933 (D.C. Cir. 2007); *see also Vantage Deepwater Co. v. Petrobras Am., Inc.*, 966 F.3d 361, 372 (5th Cir. 2020), *cert. denied*, No. 20-1032, 2021 WL 66498 (U.S. Feb. 22, 2021) (mem.).

*Crawford Pro. Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 256 (5th Cir. 2014). The standard for compelling arbitration at a location other than the one specified in an arbitration agreement is stringent: although a court may generally set aside a forum-selection clause if enforcement would be "unreasonable," we apply a "heightened standard" to setting aside *arbitral-*forum clauses in particular. *Northrop Grumman I*, 575 F.3d at 503 (quotation omitted). To avoid such a clause, a party must demonstrate that enforcement is barred by a traditional contract defense impacting the substantive validity of the agreement—including, as relevant here, impracticability. *Id.*

We also review de novo a district court's recognition and enforcement of an arbitral award. *See Timegate Studios, Inc. v. Southpeak Interactive, L.L.C.*, 713 F.3d 797, 802 (5th Cir. 2013). Our review of the underlying award is, however, very deferential—we generally uphold an arbitral tribunal's award so long as the decision "draws its essence" from the parties' agreement. *Id.* (quotation omitted). Likewise, we have held in the international arbitration context that a tribunal's decision should be overturned only if the tribunal "manifestly disregarded" the contract or the law in reaching its decision. *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 287–88, 290 (5th Cir. 2004).

## III.    Discussion

### A.    Law of the Case Doctrine

Before we dive into our merits analysis, we pause to note that two issues raised by the Ministry—the availability of an impracticability defense and, within that defense, the severability of this particular arbitral-forum clause—have already been decided by a prior panel opinion in this case. *See Northrop Grumman I*, 575 F.3d at 503. Both determinations are law of the case, unreviewable unless one of the three exceptions to that doctrine applies.

*Reeves v. AcroMed Corp.*, 103 F.3d 442, 448 (5th Cir. 1997) (noting that law of the case doctrine generally requires us to "follow the prior decisions in a case" (quotation omitted)). We see no justification for relitigating those issues and so treat both as resolved for the purposes of this appeal.

As to the first issue: the Ministry argues that pre-arbitration substantive validity defenses (like impracticability) are not available in Panama Convention cases. But the first panel opinion in this case explicitly directed the district court to consider impracticability as a pre-arbitration defense to the arbitral-forum clause at issue here. *See Northrop Grumman I*, 575 F.3d at 503. That is clearly a decision entitled to treatment as law of the case. Indeed, another panel opinion declined to reconsider the issue on the grounds that the first panel opinion had "decided" it. *Northrop Grumman III*, 430 F. App'x at 271; *see also Reeves*, 103 F.3d at 448 (declining to revisit "decisions of legal questions" from a prior panel). We agree.

As to the second issue: the Ministry argues that even if the district court was correct that arbitration in Venezuela would have been impracticable in a way that was unforeseeable, we should nevertheless reverse because, the Ministry asserts, the forum-selection clause was not severable from the arbitration agreement. On this point, the Ministry relies on our decision in *National Iranian Oil Co. v. Ashland Oil, Inc.* (*NIOC*), in which we held that a party can compel arbitration in a forum other than that specified in an arbitral-forum clause only if it shows that the clause is severable. 817 F.2d 326, 333 (5th Cir. 1987).

Although the Ministry is correct that severability is a prerequisite for voiding an arbitral-forum clause, we conclude that the first panel opinion implicitly decided that the particular arbitral-forum clause at issue here is severable. *Northrop Grumman I*, 575 F.3d at 503; *see In re Felt*, 255 F.3d 220, 225 (5th Cir. 2001) (emphasizing that any issue actually decided by a prior

panel—even an issue that was decided implicitly—is law of the case).  That implicit decision is evident from multiple features of the panel's opinion.  For one, the panel opinion cited *NIOC*, which lays out three requirements for a successful impracticability defense (impracticability, unforeseeability, and severability), but only directed the district court to consider *two* of those requirements (impracticability and unforeseeability).  *Northrop Grumman I*, 575 F.3d at 503.  What's more, the panel opinion indicated that the only "insufficien[cy]" in the record concerned "whether *the present conditions* in Venezuela render the arbitration-forum clause unenforceable."   *Id.* (emphasis added).   That question only implicates impracticability and unforeseeability; the severability inquiry does not require an analysis of "present conditions," it requires only an assessment of conditions "at the time the agreement was executed." *NIOC*, 817 F.2d at 333.

Nor can we chalk the omission of a severability discussion up to mere oversight by the prior panel opinion: in addition to the issue comprising a significant portion of the *NIOC* opinion, the Ministry also asked that panel to address severability multiple times in its briefs.  Notwithstanding this chorus of severability references, the prior panel opinion said nothing about the issue—and so must have rejected the Ministry's assertion that the clause was not severable. *See In re Felt*, 255 F.3d at 225–26 (concluding that a prior panel had implicitly decided an issue in part because the issue was briefed before the prior panel).  That implied decision is therefore entitled to treatment as law of the case. *Id.*

As law of the case, reexamination of both issues is warranted only if: (1) the district court was presented with "substantially different" evidence on remand; (2) controlling authority has changed the law applicable to the issue; or (3) the prior panel's decisions were clearly erroneous such that their continued application would result in "manifest injustice." *Reeves*, 103 F.3d at 448 (quotation omitted).  None of those conditions apply.  First, although

No. 20-60347

the district court considered additional evidence on remand (mostly concerning the political situation in Venezuela), that evidence was plainly anticipated by the first panel opinion. *See Northrop Grumman I*, 575 F.3d at 503. Second, the parties provide no indication that controlling authority has changed on either issue. Third, the prior panel opinion's decisions were not clearly erroneous. We have determined that impracticability "certainly supplies" a defense to enforcement of an arbitral-forum clause so long as the complained-of conditions were unforeseeable.[7] *NIOC*, 817 F.2d at 332. The implied severability decision, too, finds support in the features of the contract: the bespoke nature of the agreement and the fact that the Venezuelan law designated in the contract's choice of law clause could, under some circumstances, permit the arbitral forum to be moved both suggest that arbitration in Venezuela was not so essential to the agreement that selection of a different forum was manifestly unjust.

We therefore decline the Ministry's invitation to reconsider either whether pre-arbitration impracticability analysis of arbitral-forum clauses is

---

[7] As we recognized in *NIOC*, the FAA generally allows a party to challenge the substantive validity of an arbitral-forum clause under the doctrine of impracticability. 817 F.2d at 332; *see* 9 U.S.C. § 2 (permitting parties to avoid enforcement of an arbitration agreement on "such grounds as exist at law or in equity for the revocation of any contract"). The Panama Convention's implementing statute, 9 U.S.C. § 302, incorporates the FAA's general provisions on substantive validity, and we see nothing in the Panama Convention that directly conflicts with those provisions. *See* 9 U.S.C. § 302 (incorporating by reference 9 U.S.C. § 202, which, in turn, incorporates by reference 9 U.S.C. § 2); *see, e.g.*, *Freaner v. Valle*, 966 F. Supp. 2d 1068, 1078 (S.D. Cal. 2013) ("Section 2 of the FAA, which establishes the substantive validity of domestic arbitration agreements, also applies to arbitration agreements falling under the Panama Convention."). Thus, the panel in *Northrop Grumman I* was not clearly erroneous (indeed, it was correct) in concluding that impracticability is available as a defense to arbitrations falling under the Panama Convention.

No. 20-60347

appropriate under the Panama Convention or whether the district court was required to address severability on remand.

## B.    Compelling Arbitration Outside of Venezuela

To avoid enforcement of the arbitral-forum clause on impracticability grounds, Huntington Ingalls was required to show that: (1) conditions in the country made arbitration in Venezuela impracticable; and (2) Huntington Ingalls could not foresee those conditions when it entered into the contract.[8] *Northrop Grumman I*, 575 F.3d at 503; *NIOC*, 817 F.2d at 333.  We conclude that the district court did not err in determining that political conditions made arbitration in Venezuela impracticable and that such conditions were unforeseeable to Huntington Ingalls at the time it entered the contract.[9]

### 1.    Impracticability

Arbitrating in a forum can be impracticable if arbitration would be "so gravely difficult and inconvenient" that Huntington Ingalls would be "for all practicable purposes deprived of its day in court."  *McDonnell Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341, 345–46 (8th Cir. 1985) (quotation omitted) (noting that submitted affidavits indicated that a private defense contractor would not receive "a fair day in court" in Iran and declining to enforce a forum-selection clause designating that country in light of the

---

[8] As discussed above, the third prong regarding severability, *NIOC*, 817 F.2d at 333, is not at issue on this appeal.

[9] We note that our review, deferring to the district court's fact findings unless clearly erroneous, is focused entirely on the district court's resolution of the question of how conditions (as presented through record evidence to the district court) might have affected Huntington Ingalls, a U.S.-based defense contractor, if forced to arbitrate in revolutionary Venezuela.  We do not address the impact on any other company or in any other time frame.  The present conditions in Venezuela are not part of the analysis of this appeal, and we offer no comments on them.

14

ongoing Iran–Iraq war, Iran's threat to shoot down commercial planes, and the partial suspension of flights to Iran); *see generally* RESTATEMENT (SECOND) OF CONTS. § 261 cmt. d (AM. L. INST. 1981 & update 2020) ("Performance may be impracticable because extreme and unreasonable difficulty, expense, injury, or loss to one of the parties will be involved."). In that analysis, we are sensitive to the reality that political revolutions can, in some instances, dramatically limit access to justice for entities affiliated with the pre-revolutionary status quo. *See McDonnell Douglas*, 758 F.2d at 345–46; *Menendez Rodriguez v. Pan Am. Life Ins. Co.*, 311 F.2d 429, 433 (5th Cir. 1962) (concluding that Cuban refugees could not "obtain justice" from post-revolutionary Cuban courts such that the district court's *forum non conveniens* dismissal in favor of those courts was inappropriate), *vacated on other grounds*, 376 U.S. 779 (1964) (per curiam).

The district court concluded that conditions in Venezuela rose to that level.[10] In so doing, the district court apparently credited Gomez's opinion that "arbitration in Caracas would not be practicable" and Canova Gonzalez's opinion that litigating against the Venezuelan government in the country "would not result in a fair outcome, as the legal system within Venezuela favors judgments for the government."

We conclude that the district court did not err in holding the enforcement of the arbitral-forum clause to be impracticable. In coming to that conclusion, the district court was well-supported by considerable evidence indicating that the parties' arbitration in Venezuela would likely be affected by political influence and that Huntington Ingalls would likely be

---

[10] The Ministry argues that the district court applied too deferential a standard because it did not specifically use the word "impracticable" in its analysis. We conclude that the district court's citation to *NIOC* indicates that it applied the correct standard.

unable—regardless of the merits of its claims—to prevail against the Venezuelan government in any related court proceedings.

Indeed, the Ministry does not meaningfully challenge the conclusion that the political conditions in Venezuela would have made it impracticable for Huntington Ingalls to arbitrate in the country. On appeal, the Ministry does not even cite the declarations it submitted to the district court. Instead, the Ministry suggests that impracticability is a virtually impossible bar to meet because courts have declined to compel arbitration in alternative forums even when the designated arbitral forums were no longer available. But the cases the Ministry cites are actually *severability* cases; they say nothing about the bar for impracticability in this context. *See Ranzy v. Tijerina*, 393 F. App'x 174, 176 (5th Cir. 2010) (per curiam) (declining to compel arbitration in another forum because the arbitral-forum clause was an important part of the arbitration agreement); *In re Salomon Inc. S'holders' Derivative Litig. 91 Civ. 5500 (RRP)*, 68 F.3d 554, 561 (2d Cir. 1995) (same). There is, in other words, no reason to doubt that *NIOC* meant what it said— that the standard impracticability analysis "certainly supplies" a reason not to enforce an arbitral-forum clause. 817 F.2d at 332.

Given the substantial and unchallenged evidence suggesting that Huntington Ingalls would have been effectively deprived of its day in court if compelled to arbitrate in Venezuela, we conclude that the district court did not err in determining that it would be impracticable for Huntington Ingalls to arbitrate in the country.

### 2.     Unforeseeability

Next, Huntington Ingalls had to show that it could not "reasonably have foreseen" the adverse conditions at the time it entered into the contract in 1997. *Id.* at 333; RESTATEMENT (SECOND) OF CONTS. § 266 cmt. a

("[T]he affected party must have had no reason to know at the time the contract was made of the facts on which he later relies.").

The district court concluded that changes to the Venezuelan judiciary were unforeseeable, apparently crediting Canova Gonzalez's assertion that "the legal system in Venezuela has deteriorated" since the time the parties signed the contract.   Other evidence also supports the district court's conclusion on unforeseeability: Rosenn, Gomez, Canova Gonzalez, and Eloy Anzola all indicated that the start of the "Bolivarian Revolution" was the spark that made the Venezuelan judiciary a significant obstacle to Huntington Ingalls receiving an impartial arbitration.   Among other changes, the revolution and its immediate aftermath resulted in the "summar[y] sacking" of over one hundred judges and the stocking of the judiciary with provisionally appointed replacements.

None of the Ministry's submitted declarations suggested to the contrary.   Indeed, the Ministry does not even cite these declarations on appeal; instead, the Ministry merely suggests (without record citation) that Huntington Ingalls could have foreseen the impact of the "Bolivarian Revolution" because Chávez "publicly plotted his path to power" between 1994 and 1998.  But a politician planning a presidential campaign hardly puts entities on notice that the politician will prevail at the helm of a revolution, let alone that the politician will eventually exert significant political control over the country's judiciary.

Nor does *NIOC*'s unforeseeability analysis help the Ministry.  The complained-of conditions in that case were deteriorating *before* the parties entered the contract.  *NIOC*, 817 F.2d at 333.  The country's head of state had already fled the country, a key revolutionary leader had already "returned triumphantly," and the American embassy had been attacked.  *Id.* "In short," we reasoned, "the revolutionary government was in place" at

the time the parties entered their contract. *Id.* Moreover, we concluded that, as a state instrumentality, the state-run oil company had played a role in *causing* the changes in conditions: "as part of the revolutionary [g]overnment," the company bore "responsibility for creating the chain of events making it impossible for an American entity reasonably to travel to and engage in quasi-judicial proceedings in Iran." *Id.*

Neither of those features are present in this case. So it does not "def[y] credulity" to conclude that the changes that began in 1999 were unforeseeable to Huntington Ingalls. *Id.* Accordingly, we conclude that the district court did not err in holding that the conditions were unforeseeable.

\*       \*       \*

Having concluded that compliance with the arbitral-forum clause was impracticable in a way that was unforeseeable when the parties entered their contract and that our prior panel decision implicitly resolved severability, we conclude that the district court appropriately ordered arbitration in a forum other than that specified in the parties' contract.

## C.    Enforcing the Arbitral Award

The Ministry also challenges the district court's recognition and enforcement of the arbitral award. As relevant here, we must enforce the award unless one of the Panama Convention's defenses apply. *See Karaha Bodas*, 364 F.3d at 287–88; 9 U.S.C. § 302 (incorporating by reference 9 U.S.C. § 207, which requires a court to confirm an award "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention"). Those defenses "are construed narrowly"; we will only reconsider an arbitral award in "extraordinary circumstances"—such as when the tribunal "manifestly disregarded the

parties' agreement or the law." *Karaha Bodas*, 364 F.3d at 288, 290 (quotation omitted).

The only defense at issue here turns on whether the arbitration was performed "in accordance with the terms of the agreement signed by the parties." Panama Convention art. 5(1)(d), 1438 U.N.T.S. at 250. The parties' dispute on this point is narrow: the Ministry challenges only the tribunal's decision to relocate the arbitration to Brazil, arguing that the tribunal could have reexamined the district court's impracticability analysis and that the tribunal failed to give effect to either the arbitral-forum clause or the agreement to arbitrate in Washington.

The tribunal extensively considered the contract and Venezuelan law as incorporated therein. It reasoned that Article 9 of the Venezuelan Arbitration Act compelled it to determine whether the parties had reached some agreement as to arbitral forum. It recognized that the parties' contract would normally mandate arbitration in Venezuela by virtue of the arbitral-forum clause. It assessed, however, that the clause had been effectively rendered inoperative by the district court's earlier impracticability decision and, separately, by the parties' agreement to arbitrate in Washington—which the tribunal reasoned the Ministry could not renege on. The tribunal then reasoned that the parties' agreement on Washington had also failed because the Ministry continued to push for arbitration in Caracas. Without a viable arbitral-forum clause and absent another effective agreement, the tribunal reasoned, the contract's choice-of-law provision required the tribunal itself to determine the appropriate arbitral forum under Venezuelan law. Exercising that authority, the tribunal then moved the arbitral seat to Brazil to "safeguard both the neutrality and integrity of the arbitration."

All of those steps stem from close consideration of the contract and of Venezuelan law—the tribunal's decision "draws its essence" from the

agreement, *Timegate Studios*, 713 F.3d at 802 (quotation omitted), and the tribunal did not "manifestly disregard[] the parties' agreement or the law" in moving the arbitration to Brazil, *Karaha Bodas*, 364 F.3d at 290.  We therefore conclude that the district court correctly enforced the arbitral award.

Accordingly, we AFFIRM.