# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 19, 2024

Lyle W. Cayce
Clerk

————————

No. 23-20583

————————

RSM Production Corporation,

*Plaintiff—Appellee*,

*versus*

Gaz du Cameroun, S.A.,

*Defendant—Appellant*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:22-CV-3611

———————————————————————

Before Wiener, Elrod, and Wilson, *Circuit Judges*.

Cory T. Wilson, *Circuit Judge*:

This appeal asks whether the district court properly vacated part of an arbitral tribunal's "Addendum Award" as exceeding the arbitrators' power. For the reasons below, we conclude the court erred and reverse and remand with instructions to confirm the Addendum Award.

## I.

In 2001, RSM Production Corporation (RSM) and the Republic of Cameroon executed a concession contract giving RSM 100% of the right to explore and develop hydrocarbons in an area called the Logbaba Block.  In

No. 23-20583

2005, RSM and Gaz du Cameroun (GdC)[1] entered into two agreements stemming from the concession contract: a Farmin Agreement (the Farmin)[2] and a Joint Operating Agreement (JOA), which designated GdC as the Logbaba project's operator. The Farmin granted GdC 60% of RSM's 100% participating interest in the concession contract in exchange for GdC's agreement to perform the well work. As part of the Farmin's compensation scheme, RSM agreed that GdC was entitled to recover a "Payout" of 100% of its drilling costs via 100% of the production revenues, less an overriding royalty of 0.8%. The Farmin set when the Payout was to happen:

> Payout shall be deemed to occur on the first day of the calendar month following the calendar month in which the credit balance of the payout account equals the charge balance of the payout account[.]

After Payout, i.e., full cost recovery by GdC, the parties were entitled to their proportionate shares of production revenues, 60% for GdC and 40% for RSM.

As it happened, a dispute arose between the parties over the Payout date. RSM believed that GdC had achieved full cost recovery by January 2016, making the Payout date February 1, 2016. RSM also asserted that GdC improperly offset royalty payments to another entity, Cameroon Holdings, Ltd., (the CHL Royalty) against pre-Payout revenues, artificially delaying GdC's full cost recovery until May 2016, which shifted the Payout date to

---

[1] GdC was formerly known as Logbaba Development, Ltd. For ease of reference, we refer to GdC in this opinion.

[2] A farmin agreement (sometimes called "farm-in") "is a contract whereby one company acquires an interest in an exploration or production license by paying some of the past or future costs of another company that is relinquishing part of its interest." *Apache Bohai Corp., LDC v. Texaco China, B.V.*, 330 F.3d 307, 308 n.1 (5th Cir. 2003).

June 1, 2016. GdC contested RSM's version of events and insisted on the June 1 Payout date.

Under Articles 9.1 and 9.2 of the Farmin and Article 18.2(B) of the JOA, disputes between the parties were to be resolved by binding arbitration applying Texas law and International Chamber of Commerce (ICC) Rules. In October 2018, RSM filed an arbitration demand against GdC, alleging a number of claims, including three centered on the Payout dispute.[3]

In its pre-hearing filings, RSM sought $10,578,123.28 in damages for its primary Payout-related claim, which the arbitrators (hereafter, the Tribunal) labeled Claim 1. RSM explained to the Tribunal the "three steps" it took to reach that number. Step one was based on "revenues that accrued (i.e., petroleum sales) from February 1, 2016 through May 31, 2016," of which RSM's 40% share totaled $6,566,497.38. Step two accounted for RSM's $3,866,616.70 share of "sales proceeds received from February 1, 2016 for petroleum that was delivered prior to February 1, 2016." And in the third step, RSM added its $145,009.20 share of "sales proceeds received in January 2016 after GdC achieved 100% cost-recovery, but before the February 1, 2016 date of Payout."

RSM asserted two alternate damages computations—referred to by the Tribunal as Claims 2 and 3. Both were contingent on "the Tribunal . . . rul[ing] against RSM regarding the CHL Royalty and conclud[ing] that Payout occurred on June 1, 2016[,] as GdC contends." RSM expressly urged that the Tribunal need not reach either alternative claim if it "ruled for RSM regarding the CHL Royalty . . . and if it calculate[d] RSM's damages correctly at $10,578,123.28[.]"

---

[3] RSM raised 23 claims in all. GdC asserted three counterclaims. This appeal concerns only RSM's claims pertaining to the parties' Payout dispute.

No. 23-20583

After extensive discovery and a ten-day hearing, the Tribunal rendered a 142-page "Partial Final Award" addressing the parties' respective claims.[4]  The Tribunal ruled in favor of RSM as to its principal Payout claim, Claim 1, and awarded RSM $10,578,123.28 in damages.  This award tracked RSM's "three step" computation and was based on a Payout date of February 1, 2016.  The tribunal held that Claims 2 and 3 were moot "based upon the Tribunal's determination as to RSM's Claim No. 1."

Shortly after the Tribunal handed down its award, the parties jointly applied to correct two errors and thereby increase RSM's award by $47,710.  GdC separately filed a contested "Application to Correct Award and Address Omitted Claims," requesting that the Tribunal "correct" the amount awarded on RSM's Claim 1 and decide Claims 2 and 3, which GdC contended were not moot.  GdC did not challenge the Tribunal's conclusion that GdC had improperly included the CHL Royalty in its Payout calculation or its determination that February 1, 2016 was the proper Payout date.  Instead, GdC argued that the Tribunal erroneously included damages for claims related to production revenue that occurred before the Payout date, even though RSM had only prevailed with respect to the improper inclusion of the CHL Royalty.  Put differently, GdC argued that the Tribunal erred by factoring into its award damages related to Claims 2 and 3, which the Tribunal never substantively addressed.

The Tribunal held a hearing to resolve both the agreed and contested correction requests.  The Tribunal questioned the parties regarding ICC Rule 36's application to GdC's contested corrections.  Under the governing 2017

---

[4] The award was styled "Partial Final Award" because, at the parties' request, the Tribunal left for subsequent resolution the identity of the prevailing party and an award of interest, attorneys' fees, and costs of the arbitration.  Otherwise, the Tribunal's decision addressed all the parties' claims.

version of that rule, an arbitrator was permitted to "correct a clerical, computational or typographical error, or any errors of similar nature contained in an award." The Tribunal specifically grappled with whether GdC sought "a correction of law," ostensibly exceeding the Tribunal's authority, or a "correction of fact," which the Tribunal read to fall within the bounds of ICC Rule 36.

In an "Addendum to Partial Final Award" (the Addendum Award), the Tribunal granted both the agreed corrections and GdC's contested correction requests. After summarizing each side's contentions, the Tribunal addressed whether it had the authority to address the "computational errors" raised by GdC. The Tribunal first concluded that "the 2017 version of Rule 36 [was] worded broadly enough to authorize the Tribunal to analyze its ruling regarding RSM's Claim No. 1 to determine whether any computational error occurred, as requested [by GdC]." Based on its "interpretation of . . . the 2017 version of Rule 36," the Tribunal resolved that "[t]he authority to correct such computational errors is solidly within Rule 36's purview."

Satisfied of its authority to do so, the Tribunal addressed the merits of GdC's Application. The Tribunal concluded that it had "miscalculate[d] the appropriate relief due to RSM" as to Claim 1 by "factoring two calculations that the claim did not encompass[.]" The Tribunal next reasoned that correcting its Claim 1 calculation necessarily implicated the proper resolution of Claims 2 and 3, and ultimately held that GdC prevailed on the merits of the latter two claims. All told, the Tribunal sliced RSM's award under Claim 1 by $4,011,625.90—from $10,578,123.28 to $6,566,497.38.

Following the Tribunal's issuance of the Addendum Award, RSM sought to vacate the revised award in part and confirm it in part via motion filed in the Southern District of Texas. Over GdC's opposition, the district

court agreed with RSM and vacated the part of the Addendum Award that reduced RSM's recovery. In a thorough opinion, the district court concluded that "the Tribunal . . . committed a textbook case of reversing course on a substantive legal issue it previously decided." The court held that the Tribunal had exceeded its powers by conducting a "merits re-do" of RSM's claims under the guise of amending the initial award to correct "computational error[s]."

GdC now appeals, contending that the district court substituted its own reading of the parties' agreements (and by extension, of ICC Rule 36) for the Tribunal's. GdC maintains that in doing so, the district court failed to apply the well-established, highly deferential approach to judicial review of arbitral awards. Thus, GdC seeks reversal of the district court's vacatur of the Addendum Award.

## II.

"Appellate review of an order confirming or vacating an arbitration award is *de novo*." *Kemper Corp. Servs., Inc. v. Comput. Scis. Corp.*, 946 F.3d 817, 821 (5th Cir. 2020) (citing *PoolRe Ins. Corp. v. Org. Strategies, Inc.*, 783 F.3d 256, 262 (5th Cir. 2015)). "Our review of the arbitration award itself is said to be 'very deferential.'" *Id.* (quoting *PoolRe Ins.*, 783 F.3d at 262). "This court 'must sustain an arbitration award even if we disagree with the arbitrator's interpretation of the underlying contract as long as the arbitrator's decision draws its essence from the contract.'" *Id.* at 822 (quoting *Timegate Studios, Inc. v. Southpeak Interactive, L.L.C.*, 713 F.3d 797, 802 (5th Cir. 2013)). "Deference ends, though, if 'the arbitrator exceeds the express limitations of his contractual mandate.'" *Id.* at 821 (quoting *PoolRe Ins.*, 783 F.3d at 262); *see* 9 U.S.C. § 10(a)(4) (providing that a court may vacate an arbitral award under the Federal Arbitration Act when a tribunal exceeds its power in rendering the award).

The district court grounded its decision to vacate the Addendum Award on § 10(a)(4), based on the court's conclusion that the Tribunal strayed beyond its bounds by reconsidering the merits of RSM's claims. Courts interpret § 10(a)(4) narrowly, allowing vacatur of an award only "if the arbitrator acts outside the scope of his contractually delegated authority—issuing an award that simply reflects his own notions of economic justice rather than drawing its essence from the contract." *Kemper*, 946 F.3d at 822 (quoting *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013)). Thus, a party seeking to vacate an award under § 10(a)(4) "bears a heavy burden." *Id.* (same). "[T]he sole question for us is whether the arbitrator (*even arguably*) interpreted the parties' contract, not whether he got its meaning right or wrong." *Id.* (emphasis added) (quoting *Oxford Health*, 569 U.S. at 569). Courts "have no authority to review the merits" of a final award. *Id.* at 823 (quoting *Oxford Health*, 569 U.S. at 572).

## III.

GdC contends that "in assessing its power to correct its Partial Final Award and correcting the award in the Addendum, the Tribunal plainly interpreted the parties' contracts" such that the "district court's order vacating the Addendum . . . cannot stand." GdC centers on the Tribunal's construal of the ICC Rules, which were incorporated by the parties' agreements, and asserts that arbitrators' interpretation of arbitral rules is entitled to deference. RSM counters that the Tribunal exceeded its power by "engag[ing] in a substantive redetermination of RSM's contractual entitlement to Payout damages," contravening the express limitations of ICC Rule 36, which RSM contends cabins the Tribunal to correcting only true "computational" errors.

Regardless of how this court might demark the precise scope of Rule 36, our precedent aligns with GdC's position. Consider *Communications*

*Workers of America, AFL-CIO v. Southwestern Bell Telephone Company* (*CWA*), 953 F.3d 822, 824 (5th Cir. 2020), where, as here, the sole task before the court was "to determine the limits of an arbitrator's powers to reconsider a previously issued decision." *CWA* involved arbitration stemming from a company's purported violation of a collective bargaining agreement. *Id.* at 825. The modification at issue in *CWA* traveled under American Arbitration Association (AAA) Rule 40, which, like ICC Rule 36, allowed arbitrators to "correct any clerical, typographical, technical, or computational errors in the award." *Id.* at 827. In applying the rule, the arbitrator issued a modified award after committing a "technical" error—relying on an exhibit that related to a different contract than the one at issue in the case. *Id.* at 825. The union sought to vacate the award that relied on the exhibit. However, the district court rejected the challenge. *Id.* at 826.

This court affirmed, explaining that so long as an award "draw[s] its essence from the contract," a court must uphold an arbitral award, even if based on "serious error." *Id.* (quoting *United Paperworkers Int'l, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987)); *see also Oxford Health*, 569 U.S. at 572 (noting that "convincing a court of an arbitrator's error—even his grave error—is not enough" to justify vacatur); *Executone Info Sys., Inc. v. Davis*, 26 F.3d 1314, 1325 (5th Cir. 1994) (making clear that this circuit applies an "expansive reading of the 'essence' test"). Our court reasoned that the parties' agreement incorporated AAA Rule 40, the arbitrator interpreted the rule, and based on his reading, he classified his mistaken reliance on the exhibit as a "technical" error that he had the power to correct. *CWA*, 953 F.3d at 828–29. The arbitrator did not "explain why his error was 'technical' and why it did not violate Rule 40's prohibition against 'redetermin[ing] the merits' of a dispute." *Id.* at 827 (alteration in original). Yet this court held that the arbitrator's ruling was "entitled to deference" as "an arguable interpretation of the contract." *Id.* at 827–28.

*Kemper* is likewise instructive for the proposition that arbitrators also may construe arbitration rules incorporated into an arbitration agreement. In that case, this court held that an arbitration agreement authorizing the arbitrator to resolve "all disputes arising out of or relating to" the parties' agreement was sufficient to grant the arbitrator authority to "categorize damages as consequential or direct." 946 F.3d at 822. The arbitrator's authority to make that determination was not expressly delineated in the parties' agreement, but it was nonetheless "conferred by the [parties' agreement] because it [was] essential to the arbitrator's task." *Id.*

Applying *CWA* and *Kemper* here, the Tribunal not only had the contractual authority to correct computational errors, but it also had the authority to determine what constituted a computational error in the first instance. It is undisputed that the parties' agreements incorporated the ICC Rules. And ICC Rule 36 provides arbitrators the authority to "[c]orrect[] and [i]nterpret[]" the award, including any "clerical, computational or typographical error, or any errors of similar nature contained in [the] award." As explained *infra*, the Tribunal cited and interpreted Rule 36, ultimately classifying its error in the Partial Final Award as "computational." Our precedent reinforces that the parties' agreements gave the Tribunal authority to construe the meaning of the ICC Rules themselves—including, contra RSM's arguments, whether an error truly is "computational" or not. As in *Kemper*, the JOA makes clear that "[a]ny [d]ispute shall be exclusively and definitively resolved through final and binding arbitration, it being the intention of the Parties that this is a broad form arbitration agreement designed to encompass all possible disputes." The Farmin similarly reserves for the Tribunal "[a]ny and all claims, demands, causes of action, disputes, controversies and other matters in question arising out of or relating to" that agreement.

Unsatisfying as it may be for RSM, "[t]he potential for . . . mistakes is the price of agreeing to arbitration. . . . The arbitrator's construction holds, however good, bad, or ugly." *CWA*, 953 F.3d at 829 (alterations in original) (quoting *Oxford Health*, 569 U.S. at 572–73). As to this threshold scope-of-authority question, the Tribunal had both the authority to correct "computational" errors and the more foundational authority to determine, based on its reading of ICC Rule 36, what counted as one in the first place.

More to the crux of the matter, the relevant question is whether the Tribunal even arguably construed the parties' agreements when it issued the Addendum Award. *Kemper*, 946 F.3d at 822. It did.

"[I]n deciding whether an arbitrator has interpreted the contract, we are to 'consult the arbitrator's award itself' because '[t]he award will often suggest on its face that the arbitrator was arguably interpreting the contract.'" *Id.* at 823 (second alteration in original) (quoting *BNSF Ry. Co. v. Alstom Transp., Inc.*, 777 F.3d 785, 788 (5th Cir. 2015)). And in consulting the award, "we consider the following as relevant evidence: '(1) whether the arbitrator identifies his task as interpreting the contract; (2) whether he cites and analyzes the text of the contract; and (3) whether his conclusions are framed in terms of the contract's meaning.'" *Id.* (alterations accepted) (quoting *BNSF*, 777 F.3d at 788). It is of no consequence "whether [the Tribunal's] interpretations of [the parties' agreements] or the governing law were correct." *Id.* (quoting *BNSF*, 777 F.3d at 788). This is so because "[i]t is the arbitrator's construction of the contract which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *Id.* (quoting *Oxford Health*, 569 U.S. at 573).

Applied here, the Tribunal satisfied *Kemper*'s test for determining whether it "arguably interpreted" the contract. First, the Tribunal noted

that ICC Rule 36—as incorporated into the parties' arbitration contracts—was "worded broadly enough to authorize the Tribunal to analyze its ruling regarding RSM's Claim No. 1 to determine whether any computational error occurred[.]"  Next, the Tribunal reasoned that Rule 36 "expressly [gave] the Tribunal authority to act . . . .  This conclusion derive[d] from the Tribunal's interpretation of the wording of the 2017 version of Rule 36 encompassing 'computational' errors."   Finally, the Tribunal concluded that "[t]he authority to correct such computational errors is solidly within Rule 36's purview."   This logical progression plainly maps onto *Kemper*'s requirements.

RSM maintains that the Tribunal's "assertion that it was interpreting its limited authority to correct 'computational errors' revealed an interpretation in name only" because the Addendum Award was not "rationally inferable from the contract."  RSM points to *Beaird Industries, Inc. v. Local 2297, International Union*, 404 F.3d 942, 947 (5th Cir. 2005), for support:  "Simply referencing the agreement is insufficient for this court to uphold the award"; instead, "[t]he Arbitrator must show that the award is rationally inferable in some logical way from the agreement."  But RSM's reliance on *Beaird* is misplaced.

Factually, the arbitrator's award in *Beaird* was wholly disconnected from the parties' agreement.  There, a collective bargaining agreement gave the employer the sole and exclusive right to subcontract work in any area of its facility.  *Id.* at 945.  The arbitrator recognized that this language did not limit any right to subcontract, yet out of whole cloth ruled in favor of the union because he was "not convinced that the cost savings . . . outweigh[ed] the adverse impact on the [agreement]."  *Id.* (first alteration in original). There was no indication the arbitrator attempted to interpret the agreement—the arbitrator simply put forth his "own brand of industrial justice."  *Id.* at 947.  Thus, RSM overplays the importance of *Beaird*'s

"simply referencing the agreement" distinction.   Indeed, the *Beaird* arbitrator's maneuver was so divorced from the parties' agreement that the court could not discern that the award was "rationally inferable in some logical way from the agreement." *Id.* (citation omitted).

Taken together, the Tribunal "arguably construe[d] the parties' contract[s]," such that the Addendum Award "must stand." *Kemper*, 946 F.3d at 823.

\*       \*       \*

We REVERSE the district court's judgment and REMAND with instructions to confirm the Addendum Award.