# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 11, 2025

Lyle W. Cayce
Clerk

––––––––––

No. 23-20140

––––––––––

Scott Sullivan; Frank Dellacroce; St. Charles
Surgical Hospital, L.L.C.; St. Charles Holdings, L.L.C.;
Center for Breast Restorative Surgery, L.L.C.; Sigma
Delta Billing, L.L.C.; Cerberus Insurance Corporation;
Janus Insurance Corporation; Orion Insurance
Corporation,

*Plaintiffs—Appellees*,

*versus*

Stewart A. Feldman; The Feldman Law Firm, L.L.P.;
Capstone Associated Services (Wyoming), Limited
Partnership; Capstone Associated Services, Limited;
Capstone Insurance Management, Limited; Jeff
Carlson,

*Defendants—Appellants*,

––––––––––––––––––––––––––––––––––

Scott Sullivan; Frank Dellacroce; St. Charles
Surgical Hospital, L.L.C.; St. Charles Holdings, L.L.C.;
Center for Breast Restorative Surgery, L.L.C.; Sigma
Delta Billing, L.L.C.; Cerberus Insurance Corporation;
Janus Insurance Corporation; Orion Insurance
Corporation,

*Defendants—Appellees*,

*versus*

STEWART A. FELDMAN; THE FELDMAN LAW FIRM, L.L.P.;
CAPSTONE ASSOCIATED SERVICES (WYOMING), LIMITED
PARTNERSHIP; CAPSTONE ASSOCIATED SERVICES, LIMITED;
CAPSTONE INSURANCE MANAGEMENT, LIMITED; JEFF
CARLSON,

*Plaintiffs—Appellants*,

_____

SCOTT SULLIVAN; FRANK DELLACROCE; ST. CHARLES
SURGICAL HOSPITAL, L.L.C.; ST. CHARLES HOLDINGS, L.L.C.;
CENTER FOR BREAST RESTORATIVE SURGERY, L.L.C.; SIGMA
DELTA BILLING, L.L.C.; CERBERUS INSURANCE CORPORATION;
JANUS INSURANCE CORPORATION; ORION INSURANCE
CORPORATION,

*Plaintiffs—Appellees*,

*versus*

STEWART A. FELDMAN; THE FELDMAN LAW FIRM, L.L.P.;
CAPSTONE ASSOCIATED SERVICES (WYOMING), LIMITED
PARTNERSHIP; CAPSTONE ASSOCIATED SERVICES, LIMITED;
CAPSTONE INSURANCE MANAGEMENT, LIMITED; JEFF
CARLSON,

*Defendants—Appellants*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC Nos. 4:20-CV-2236, 4:21-CV-658,
4:21-CV-682

_____

Before JONES, SMITH, and HO, *Circuit Judges*.

EDITH H. JONES, *Circuit Judge*:

On appeal is a district court's judgment confirming four arbitration
awards resulting from four arbitrations between the same parties. The

awards, however, contradict one another, and each confirmed award reflects a different amount owed by Defendants-Appellants to the Appellees. We AFFIRM in part, REVERSE in part, VACATE in part, and REMAND.

To be clear, we AFFIRM the Glasser, Baker, and Kutcher arbitration awards because no grounds exist under the Federal Arbitration Act to vacate them. We AFFIRM in part the Jones arbitration award but REVERSE in part insofar as the Jones award pertains to defendant Jeff Carlson, because Carlson did not sign the arbitration agreement and was not otherwise bound by it. We VACATE and REMAND the district court's March 22, 2021, order staying further arbitrations between the parties so that the inconsistency among the awards can be arbitrated.

## BACKGROUND

### I. Underlying Facts

Doctors Scott Sullivan and Frank DellaCroce are surgeons at the Center for Restorative Breast Surgery in New Orleans, Louisiana. The Doctors own several business entities (the "Doctor Entities"), including Cerberus Insurance Corp., Janus Insurance Corp., and Orion Insurance Corp. (the "Captive Insurers"), as well as St. Charles Surgical Hospital, L.L.C., St. Charles Holdings, L.L.C., Center for Breast Restorative Surgery, L.L.C., and Sigma Delta Billing, L.L.C. Seeking to pool their risks through certain insurance arrangements, the Doctors entered a turnkey agreement with Stewart Feldman and the Feldman Law Firm, LLP (the "Feldman Parties"), by way of an Engagement Letter dated October 22, 2015. Attached to that Engagement Letter is a "Capstone Services Agreement." Allegedly at the direction of Feldman, who also signed the Capstone Services Agreement, the Doctors contracted with Capstone Associated Services (Wyoming), LP, Capstone Associated Services, Ltd., and Capstone Insurance Management, Ltd. (the "Capstone Parties").

The Doctors allege that Feldman encouraged them to form the Captive Insurers and have them participate in "third party insurance and reinsurance through PoolRe." The Engagement Letter describes PoolRe as a "risk pooling arrangement involving sets of generally similar policies covering generally similar risks of closely held businesses, wherein each [Captive Insurer] assumes reinsurance on policies covering other clients of Capstone." The Doctors claim that Feldman did not disclose that he used the insurance pool to underwrite malpractice and breach of fiduciary duty claims against Feldman himself and Capstone. The Doctors further allege that, although the Engagement Letter entitled them to demand that Feldman and Capstone wind down the Captive Insurers at any time, Feldman and Capstone failed to do so even after several requests by the Doctors. They made these requests after learning of a United States Tax Court judgment holding "that PoolRe was not a bona fide insurance company." *See Rsrv. Mech. Corp. v. Comm'r*, 115 T.C.M. (CCH) 1475 (T.C. 2018), *aff'd* 34 F.4th 881 (10th Cir. 2022).

## II. The Arbitration Provision

The Engagement Letter contains an extensive arbitration provision. The Engagement Letter provides:

> [E]ither party may submit the dispute to any recognized, neutral . . . arbitrator for final resolution in an arbitration proceeding to be concluded within four months, except that the American Arbitration Association (AAA) shall not administer the arbitration. Submission of the dispute under this agreement shall be the sole and exclusive forum for resolving any and all disputes between the parties, except for attorneys' fees for services previously rendered.

The Engagement Letter requires that all arbitrations be conducted pursuant to Texas Law and the Rules of the American Arbitration Association

("AAA"), "with only a single arbitrator hearing the dispute." It further states that the arbitrator "shall have the sole and exclusive ability to rule on all aspects of the arbitrator's appointment." And it provides that the "arbitration provision shall be effective notwithstanding any actions that may later take place."

> The Engagement Letter then discusses the issue of arbitrability:

> The parties agree that the issue of arbitrability shall likewise be decided by the arbitrator, and not by any other person. That is, the question of whether a dispute itself is arbitrable shall be decided solely by the arbitrator and not, for example, by any court. The parties agree that the arbitrator has exclusive authority to resolve all disputes and challenges to the enforceability of the parties' agreements as a whole. The parties agree that their intent is to divest the courts of all powers in disputes involving the parties, except to compel arbitration, and to confirm, vacate or enforce award.

And, finally, the Engagement Letter provides, if the four-month timeline to complete an arbitration is not met, "any party then may file another written demand for arbitration of the dispute with another" arbitrator, "with the prior arbitrator . . . then being immediately divested of jurisdiction," and the four-month timeline starting afresh for the new arbitration. The Capstone Services Agreement incorporates these provisions of the Engagement Letter.

## III. *Bleak House*

The numerous arbitrations that followed led the district court to call this case "the *Bleak House* of arbitration." *Sullivan v. Feldman (Dist. Ct. Op.)*, H-20-2236, 2022 WL 17822451, at *4 (S.D. Tex. Dec. 20, 2022). In May 2020, the Feldman and Capstone Parties initiated arbitration before former state District Judge Grant Dorfman, who is now a judge of the Texas Business Court. That arbitration only concerned the winding up of the

No. 23-20140

Captive Insurers. The Doctors and the Doctor Entities (collectively, "the Doctors") then initiated arbitration in New Orleans before retired United States District Judge Stanwood Duval. And in July 2020, the Feldman and Capstone Parties initiated another arbitration before former Texas state District Judge Caroline Baker. The parties filed motions in federal court to compel their respectively initiated arbitrations. In August 2020, the district court granted the Feldman and Capstone motions to compel the Dorfman[1] and Baker arbitrations and, until their resolution, it stayed the Duval arbitration. *Sullivan v. Feldman*, H-20-2236, 2020 WL 4734982 (S.D. Tex. Aug. 14, 2020). The Doctors appealed but voluntarily withdrew their appeal in February 2021.

In late July 2020, the Doctors initiated another arbitration before arbitrator Robert Kutcher, another in August 2020 before former Orleans Parish, Louisiana, Civil District Court Judge Lloyd Medley, and yet another in November 2020 before former Orleans Parish Civil District Court Judge Carolyn Gill-Jefferson.

In November 2020, the Feldman and Capstone parties moved to stay the Kutcher, Medley, and Gill-Jefferson arbitrations. *Sullivan v. Feldman*, H-20-2236, 2020 WL 7129879, at *10–11 (S.D. Tex. Dec. 4, 2020). The district court denied the motion to stay, reasoning that nothing in the Engagement Letter prohibited simultaneous arbitrations and that inefficiency concerns were not within the court's purview but were instead for the arbitrators to resolve. *Id.* at *9–10.

In December 2020, the Feldman and Capstone Parties initiated arbitration before arbitrator Mark Glasser and the Doctors initiated

---

[1] The Dorfman arbitration ended with an award, albeit after the four-month deadline, and that award is no longer challenged.

6

arbitration before former Louisiana Fourth Circuit Court of Appeal Judge Charles Jones. The Feldman and Capstone Parties also initiated an arbitration before arbitrator James Doyle, although the record does not make clear precisely when that occurred.

Then, in March 2021, the district court enjoined the Feldman and Capstone Parties "from initiating yet more state, federal, or arbitration proceedings involving the same parties, underlying contract, or the same or related disputes." *Sullivan v. Feldman*, No. 4:20-cv-02236 (S.D. Tex. Mar. 22, 2021) (order consolidating cases and enjoining further arbitrations).

In August 2021, Baker, Kutcher, Jones, and Glasser together presided over a single evidentiary hearing, where the same evidence and witnesses were presented. The hearing took place at a five-star resort, resulting in room fees in excess of $300,000. At various points during the hearing, the arbitrators issued conflicting evidentiary rulings. And on the hotly disputed subject of class arbitrability, Judge Jones and Arbitrator Glasser disagreed with each other vocally from the bench.

## IV. Final Four Awards

Only the four arbitrators who presided over the shared evidentiary hearing issued final awards. The district court summarized:

> Judge Duval has stayed the arbitration proceedings before him. Judge Medley determined that his jurisdiction had expired. Judge Gill-Jefferson declined her appointment. And the Feldman and Capstone Parties voluntarily dismissed the arbitration they initiated before Mr. Doyle. The remaining four arbitrators (Judge Baker, Mr. Kutcher, Mr. Glasser, and Judge Jones) issued the awards that are disputed here. All four arbitrators issued final awards in favor of the Doctors . . . finding that Feldman and his related entities breached their fiduciary duties, committed malpractices, and converted funds belonging to the Doctors.

No. 23-20140

*Dist. Ct. Op.*, 2022 WL 17822451, at \*5. All four awards were issued after the contractual four-month deadline to complete arbitration had expired. In a joint order, the arbitrators all agreed that the deadline was unenforceable as unconscionable and inconsistent with due process. But the amounts awarded by each arbitrator differed:

| Arbitrator | Merits | Fees & Costs | Total Award |
|------------|--------|--------------|-------------|
| Baker | $1,471,949.21 | $126,383.75 | $1,598,332.96 |
| Kutcher | $4,415,847.63 | $143,703.07[*] | $4,559,550.70 |
| Glasser | $1,471.949.21 | $0.00 | $1,471.949.21 |
| Jones | $70,336,224.60 | $18,348,294.60 | $88,684,519.20[†] |

*Id.* at \*6. Each award bears 5 percent pre- and post-judgment interest.

Besides differing in amounts awarded, the arbitrators' decisions do not agree on other significant issues. Judge Jones permitted class arbitration,[2]

---

[*] This amount includes $17,319.32 in unpaid sanctions.

[†] This amount does not include the $31,090,964.45 in class damages that Judge Jones granted in a second award issued on November 1, 2022, nor does it include the additional fees and costs Jones awarded in the second award. The district court explicitly "left the claims for damages of Class Members still outstanding" until after this court's judgment on appeal. *Sullivan v. Feldman*, H-20-2236, 2023 WL 2392746, at \*1 (S.D. Tex. Mar. 7, 2023); *Sullivan v. Feldman*, H-20-2236, 2023 WL 2391009, at \*2 (S.D. Tex. Mar. 7, 2023). Accordingly, the Jones arbitration's class damages award is not before this court in this appeal.

[2] Judge Jones adopted Judge Medley's order certifying the class after Judge Medley withdrew pursuant to the four-month provision. Judge Jones questionably used "opt-out notices" to handle the certification of the class, even though "where absent class members have not been required to opt in, it is difficult to see how an arbitrator's decision to conduct class proceedings could bind absent class members who have not authorized the arbitrator to decide on a classwide basis which arbitration procedures are to be used." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 574–75, 133 S. Ct. 2064, 2071–72 (2013) (Alito, J.,

but arbitrator Glasser, the only other arbitrator to consider that issue, concluded that the Engagement Letter did not permit class arbitration.[3] The Jones arbitration held liable defendant Jeff Carlson, who became President of Capstone Associated Services, Ltd., after the Engagement Letter was signed by the parties. But the Baker, Kutcher, and Glasser arbitrations all dismissed individual claims against Carlson.

Before the district court, the parties filed several cross-motions to vacate and confirm the respective awards. The district court confirmed all four awards. The Feldman Parties, the Capstone Parties, and Carlson moved for "clarification," which the district court characterized as a motion to reconsider and denied. *Sullivan v. Feldman*, H-20-2236, 2023 WL 2391009 (S.D. Tex. Mar. 7, 2023). The district court then entered a Partial Final Judgment embodying all four awards in their riotously varying glory. *Sullivan*

---

concurring). Judge Jones's approach was also in tension with required federal court practices, which protect the constitutional due process rights of defendants. A class can only be certified in federal court when, *inter alia*, "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). Then, in cases like this one, the prospective class must show that "questions of law or fact common to class members predominate over any questions affecting only individual members." FED. R. CIV. P. 23(b)(3). A prospective multi-state class bears the burden of refuting that "the variations in the laws of the states . . . 'may swamp any common issues and defeat predominance.'" *Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 311 (5th Cir. 2000) (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996)). Accordingly, if this controversy had been litigated in federal court, the class needed to provide "'an extensive analysis of state law variations' so that the district court could 'consider how those variations affect[ed] predominance.'" *Elson v. Black*, 56 F.4th 1002, 1006–07 (5th Cir. 2023) (quoting *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007)). Not so in Judge Jones's arbitration. In stark contrast, Judge Medley's order certifying the class, which was adopted by Judge Jones, was a mere eight pages, including his analysis of whether the agreement even allowed class arbitration, and with only two conclusory paragraphs addressing predominance.

[3] In June 2021, before issuing an award, Judge Jones ordered another arbitration to resolve the conflict between him and Arbitrator Glasser on the subject of class arbitrability. No such arbitration took place.

*v. Feldman (Partial Final Judgment)*, H-20-2236, 2023 WL 2392746 (S.D. Tex. Mar. 7, 2023). The district court also entered judgment against Carlson jointly and severally with other defendants based on the Jones award, which amounted at that date to $94,542,659.80, with daily accruing post-judgment interest of nearly $13,000.

The district court certified the Partial Final Judgment pursuant to Federal Rule of Civil Procedure 54(b). This court has appellate jurisdiction. The district court retained jurisdiction separately to confirm and enforce the class damages award that resulted from the Jones arbitration. The Feldman and Capstone Parties and Carlson appealed.

## V. Post-Appeal Attempt to Initiate a Tenth Arbitration

In July 2023, after filing their appeal, the Feldman and Capstone Parties initiated another arbitration before arbitrator Jay Madrid. They argued that another arbitration could resolve the conflicting confirmed awards because the district court stated that the "arbitrators are authorized to determine whether and when earlier decisions or awards have preclusive effects." *Dist. Ct. Op.*, 2022 WL 17822451, at \*16. The Doctors promptly requested the district court to enforce its earlier injunction barring further arbitration and to issue another injunction prohibiting any further activity in the post-judgment arbitration. *See Sullivan v. Feldman*, No. 4:20-cv-02236 (S.D. Tex. Mar. 22, 2021) (order consolidating cases and enjoining further arbitrations). Following an emergency hearing on the motion on July 20, 2023, the court maintained that there were to be no further attempts to arbitrate until a decision from the court. The court further suggested that it would be best to prevent any further arbitration until a decision issued from this court. After additional briefing, on November 30, 2023, the district court formally took the parties' respective motions under advisement. Thus far, the parties' cross-motions are unresolved.

No. 23-20140

## STANDARD OF REVIEW

"Appellate review of an order confirming an arbitration award proceeds *de novo*, using the same standards that apply to the district court." *21st Fin. Servs., L.L.C. v. Manchester Fin. Bank*, 747 F.3d 331, 335 (5th Cir. 2014) (quoting *Brown v. Witco Corp.*, 340 F.3d 209, 216 (5th Cir. 2003)).

## DISCUSSION

On appeal, the Feldman and Capstone Parties levy numerous challenges against the district court's judgment.[4] First, they dispute whether the Engagement Letter delegated to the arbitrators the right to decide whether the Engagement Letter permitted class arbitration. Second, they contend that the district court erred in permitting multiple arbitrations to proceed simultaneously. Third, they argue that the district court erred in confirming multiple, inconsistent arbitration awards. Finally, they assert that the district court erred in confirming an arbitration award against Carlson individually.

We first address the questions of class arbitrability, the four-month deadline, and whether simultaneous arbitrations were permissible. These issues all turn on the interplay between federal courts' scope of review and arbitrators' delegated authority under arbitration contracts. Here, the

---

[4] One is the mistaken assertion that this case lacks diversity jurisdiction. "A federal court may entertain an action brought under the [Federal Arbitration Act ("FAA")] only if the action has an independent jurisdictional basis." *Badgerow v. Walters*, 596 U.S. 1, 8, 142 S. Ct. 1310, 1316 (2022) (quotation marks and citations omitted). *Badgerow* holds that, when dealing with sections 9 and 10 of the FAA, courts cannot "look through . . . to the underlying substantive dispute" to find jurisdiction, but instead must apply "the usual jurisdictional rules" to the "face of the FAA application itself." *Id.* at 15–17, 142 S. Ct. at 1320–21. Here, diversity of citizenship is complete because the Doctors and Captive Insurers are all citizens of Louisiana or Delaware while none of the Feldman or Capstone Parties are. The amount in controversy requirement is satisfied. Federal courts have jurisdiction.

appropriate deferential standards compel us to reject all three of these challenges. Next, we examine the district court's judgment that purports to confirm all four awards, while entering an amount that reflects the single highest award. We conclude that the district court misapplied a years-old stay order in an overbroad manner to prevent the parties from arbitrating the remaining two awards' irreconcilability. Finally, we agree with Carlson's objections to the district court's confirmation of the Jones award and vacate the judgment against him.

## I. Class Arbitrability, the Four-Month Deadline, and Simultaneous Overlapping Arbitrations

The Feldman and Capstone Parties contend that the Engagement Letter did not authorize Judge Jones to proceed with class arbitration; the arbitrators could not conclude that the four-month time limit to complete the arbitrations was unconscionable; and the arbitrations could not proceed simultaneously to adjudicate the same controversies. These issues depend on the interplay between federal courts' review of agreements to arbitrate under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, and the scope of authority committed to arbitrators. Overarching this discussion is the express intent stated in the Engagement Letter (drafted by Feldman) "to divest the courts of all powers in disputes involving the parties, except to compel arbitration and confirm, vacate or enforce the award."

"Under the Federal Arbitration Act, parties to a contract may agree that an arbitrator rather than a court will resolve disputes arising out of the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65, 139 S. Ct. 524, 527 (2019). On issues that "grow out of the dispute and bear on its final disposition," courts "will sustain an arbitration award as long as the arbitrator's decision 'draws its essence' from the contract—even if we disagree with the arbitrator's interpretation of the contract." *John Wiley &*

*Sons, Inc. v. Livingston*, 376 U.S. 543, 557, 84 S. Ct. 909, 918 (1964) (first quote); *Timegate Studios, Inc. v. Southpeak Interactive, L.L.C.*, 713 F.3d 797, 802 (5th Cir. 2013) (quoting *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1320 (5th Cir. 1994)) (second quote).  In those cases, "the sole question for us is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong."  *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569, 133 S. Ct. 2064, 2067 (2013).

In addition, the Supreme Court has "held that parties may agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.'" *Henry Schein*, 586 U.S. at 67–68, 138 S. Ct. at 529 (quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69, 130 S. Ct. 2772, 2777 (2010)).  But "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S. Ct. 1920, 1924 (1995) (quotations and alterations omitted).  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S. Ct. 927, 941 (1983); *see also Timegate Studios*, 713 F.3d at 802.  But once a court finds that the parties *did* agree to arbitrate questions of arbitrability, the arbitrator's answers to those questions are reviewed under the deferential FAA standard and will be affirmed if "the arbitrator (even arguably) interpreted the parties' contract." *Oxford Health Plans*, 569 U.S. at 569, 133 S. Ct. at 2067.

No. 23-20140

## A. The Engagement Letter Left Class Arbitrability to the Arbitrator.

1.

Whether an arbitration agreement permits class-action-style claims to be arbitrated requires additional background. The foundational principle is that "courts may not . . . reshape traditional individualized arbitration by mandating classwide arbitration procedures without the parties' consent." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 509, 138 S. Ct. 1612, 1623 (2018). Accordingly, "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684, 130 S. Ct. 1758, 1775 (2010). Because of "the differences between bilateral and class-action arbitration," it cannot be "that the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings." *Id.* at 687, 130 S. Ct. at 1776. Moreover, as the Supreme Court explained recently, "[l]ike silence, ambiguity does not provide a sufficient basis to conclude that parties to an arbitration agreement agreed to" class arbitration. *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 185–86, 139 S. Ct. 1407, 1416–17 (2019).

In light of *Lamps Plus*, this court concluded that class arbitrability is a gateway issue that courts leave to arbitrators only when the agreement evinces that the parties "clearly and unmistakably" intended that result. *20/20 Commc'ns, Inc. v. Crawford*, 930 F.3d 715, 718–19 (5th Cir. 2019). Neither silence nor ambiguity satisfies that standard. *Id.*; *see also Stolt-Nielsen*, 559 U.S. at 684, 130 S. Ct. at 1775; *Lamps Plus*, 587 U.S. at 185–86, 139 S. Ct. at 1416–17. However, as with other gateway questions, when a court determines that the delegation of class arbitrability to the arbitrator was clear and unmistakable, then the arbitrator's determination as to whether to

14

certify a class is reviewed deferentially pursuant to the FAA. *Oxford Health Plans*, 569 U.S. at 573, 133 S. Ct. at 2070–71.

2.

Based on this court's application of the above authorities, we are reluctantly bound to conclude that the Engagement Letter's mere incorporation of the AAA Commercial Arbitration Rules constitutes sufficiently clear and unmistakable evidence that the parties *intended* to delegate class-wide arbitrability to the arbitrator.

When an arbitration agreement "explicitly refers to the AAA rules, those rules become 'incorporated' into the agreement between the parties." *Commc'ns Workers of Am., AFL-CIO v. Sw. Bell Tel. Co.*, 953 F.3d 822, 827 (5th Cir. 2020) (quoting *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012)). And an "agreement to the AAA's Commercial Rules also constitutes consent to the Supplementary Rules." *Reed v. Fla. Metro. Univ., Inc.*, 681 F.3d 630, 635 (5th Cir. 2012), *abrogated on other grounds by Oxford Health Plans*, 569 U.S. at 568, 133 S. Ct. at 2068. One of the Supplementary Rules provides that "the arbitrator shall determine as a threshold matter . . . whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class."

This court recently held that an arbitration agreement's incorporation of a generic rule can be sufficiently clear and unmistakable under *20/20 Communications* to delegate class arbitrability inquiries to the arbitrator. *See Work v. Intertek Res. Sols., Inc.*, 102 F.4th 769 (5th Cir. 2024). In *Work*, this court considered an incorporated JAMS rule providing that "[j]urisdictional and arbitrability disputes, including disputes over the . . . interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator." *Id.* at 772. Language in the JAMS Employment Rules that

broadly referenced the arbitrator's duties was thus held sufficient to commit the arbitration of a collective action, an employment claim similar to a class action, to the arbitrator. In contrast with the generic language in *Work*, the AAA Supplemental Rule incorporated here specifically delegates the question of class arbitrability. Therefore, because the AAA Supplemental Rule is clearer than that found in *Work* to satisfy *20/20 Communications*, we must hold that the Engagement Letter unambiguously[5] delegated the question of class-wide arbitrability to the arbitrators and authorized Judge Jones to resolve that question. Because Judge Jones allowed class arbitration to go forward based on his interpretation of the Engagement Letter, although Glasser's refusal to permit class-wide arbitration was equally permissible, this court will not upset Jones's conclusion. *See Sun Coast Res., Inc. v. Conrad*, 956 F.3d 335, 337–38 (5th Cir. 2020).

---

[5] The Feldman and Capstone Parties attempt to engineer ambiguity by citing to other agreements among some of the parties that contain provisions barring class arbitration. Texas contract law maintains that "separate instruments or contracts executed at the same time, for the same purpose, and in the course of the same transaction are to be considered as one instrument, and are to be read and construed together" even if the agreements do not have all the same signatories. But that "does not mean that all are bodily consolidated into one instrument so that every provision in one instrument thereby becomes a part of every other instrument." *Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex. 1981) (first quote); *Lawrence v. United States*, 378 F.2d 452, 461 (5th Cir. 1967) (second quote). The parties' later agreements cannot be read together with the Engagement Letter for at least three reasons. First, they were executed years after the Engagement Letter. Second, their purposes differed. *Speedemissions, Inc. v. Bear Gate, L.P.*, 404 S.W.3d 34, 44–46 (Tex. App.—Houston [1st Dist.] 2013); *Amerisource Funding, Inc. v. GrandSouth Bank*, No. 4:15–CV–03569, 2017 WL 4479190, at *5–6 (S.D. Tex. 2017). Third, the Engagement Letter and Capstone Services Agreement by their express terms formed the "complete agreement," which could "be amended, modified, or supplemented only by written agreement executed by the parties hereto with specific, written reference to this Agreement." The later agreements neither referred to the Engagement Letter or Capstone Services Agreement, nor were they signed by all the parties to the initial agreements.

No. 23-20140

3.

Further discussion of *Work* is warranted. That decision seems questionable in holding that the incorporation of a general rule delegating arbitrability,[6] but silent as to class arbitrability, clearly and unmistakably delegates class arbitrability to the arbitrator under this court's *20/20 Communications* and the Supreme Court's *Lamps Plus* precedents. *See 20/20 Commc'ns*, 930 F.3d 715 (5th Cir. 2019); *Lamps Plus*, 587 U.S. 176, 139 S. Ct. 1407 (2019).

Although all circuits agree that class arbitrability presents a gateway question, they disagree on whether an agreement's incorporation of generic rules permitting class arbitration can ever constitute clear and unmistakable consent to class arbitration. *Compare Spirit Airlines, Inc. v. Maizes*, 899 F.3d 1230, 1233–34 (11th Cir. 2018) ("The parties' agreement plainly chose the AAA rules . . . . this is clear and unmistakable evidence that the parties chose to have an arbitrator decide whether their agreement provided for class arbitration."); *Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 398–99 (2d Cir. 2018) (same); *Dish Network L.L.C. v. Ray*, 900 F.3d 1240, 1247–48 (10th Cir. 2018) (same); *with Catamaran Corp. v. Towncrest Pharm.*, 864 F.3d 966, 972–73 (8th Cir. 2017) ("Incorporation of AAA rules by reference is insufficient evidence that the parties intended for an arbitration to decide substantive questions of class arbitration. When dealing with class arbitration, we seek clear and unmistakable evidence of an agreement to arbitrate the particular question of class arbitration.") (citation omitted);

---

[6] Arguably, it is possible to construe the rule incorporated in *Work* to include class arbitrability because the rule delegated the question of "who are proper Parties to the Arbitration" to the arbitrator. That interpretation seems to be less than clear and unmistakable under *20/20 Communications*, but the *Work* court did not rely on that clause of the JAMS rule.

17

*Chesapeake Appalachia, L.L.C. v. Scout Petroleum, L.L.C.*, 809 F.3d 746 (3d Cir. 2016) (same); *Reed Elsevier, Inc. ex rel. LexisNexis Div. v. Crockett*, 734 F.3d 594, 599–600 (6th Cir. 2013) (same); *Dell Webb Cmtys., Inc. v. Carlson*, 817 F.3d 867, 876–77 (4th Cir. 2015) (same).

*Work*, however, is an apparent outlier even among the circuits in which incorporation of rules suffices clearly and unmistakably to delegate the gateway question of class arbitrability to arbitrators. No other circuit court has held that a rule generally delegating arbitrability questions carries with it a delegation of class arbitrability. *Work* implicitly mirrors pre-*Lamps Plus* and *20/20 Communications* cases, which held that general arbitrability delegations also include delegations of class arbitrability. *See, e.g.*, *Robinson v. J & K Admin. Mgmt. Servs., Inc.*, 817 F.3d 193, 197 (5th Cir. 2016) ("[I]f parties agree to submit the issue of arbitrability to the arbitrator, then the availability of class or collective arbitration is a question for the arbitrator instead of the court." (citing *Pedcor Mgmt. Co., Inc. Welfare Benefit Plan v. Nations Pers. of Tex., Inc.*, 343 F.3d 355 (5th Cir. 2003))); *compare Reed v. Fla. Metro. Univ., Inc.*, 681 F.3d 630, 635 (5th Cir. 2012) ("agreement to the AAA's Commercial Rules also constitutes consent to the Supplemental Rules," including those rules' class arbitrability delegation), *with id.* at 646 (Dennis, J., concurring) (opining that *Reed*'s holding that an incorporated rule "referring the issue of class arbitration *vel non* to the arbitrator" was "required by our circuit precedent in *Pedcor*").

It is not obvious that such precedents remained good law after *20/20 Communications* and after the Supreme Court admonished in *Lamps Plus* that ambiguity as to class arbitrability is insufficient. The *20/20 Communications* court described some of the general delegation language at issue in that case as "arguably capacious enough under this court's previous rulings to include disputes over class arbitrability." 930 F.3d at 720 (citing *Robinson*, 817 F.3d at 196); *see also JPay, Inc. v. Kobel*, 904 F.3d 923, 935 (11th Cir. 2018)

(characterizing *Pedcor* and *Robinson* as predicated on class arbitrability's not being a gateway question). Still, the *20/20 Communications* court did not expressly address whether *Robinson* and *Pedcor* remained viable, and based its holding instead on an express class arbitration bar in the arbitration agreement. And *Lamps Plus* involved a broad agreement submitting "any and all disputes, claims, or controversies" to arbitration, which the dissent viewed as sufficient to delegate the dispute over class arbitrability. 587 U.S. at 206, 139 S. Ct. at 1428 (Kagan, J., dissenting). The Supreme Court necessarily *rejected* the dissent's interpretation in holding the agreement ambiguous on class arbitrability. *Id.* at 182–83, 139 S. Ct. at 1414–15.

The *Work* court perfunctorily answered the question whether a broad arbitrability delegation includes class arbitrability in reliance on a single pre-*20/20 Communications* case: *Cooper v. WestEnd Capital Management, L.L.C.*, 832 F.3d 534 (5th Cir. 2016). *Cooper* held only that the incorporation of an earlier version of the same JAMS rule at issue in *Work* was enough to delegate general arbitrability clearly and unmistakably to the arbitrator. *Id.* at 546. But *Cooper* did not concern class arbitrability, nor, because *Cooper* also preceded *20/20 Communications* and *Lamps Plus*, did it address the viability of *Pedcor* and *Pedcor*'s progeny. *Work* likely misinterpreted *Lamps Plus* by extending *Cooper* to find a generic delegation rule unambiguous. *Work*, 102 F.4th at 771. In sum, this court inadvertently became an outlier on the far side of a circuit split.

But, because we are bound by *Work*, we must hold that the Engagement Letter's incorporation of the AAA Rules, and by extension the AAA Supplementary Rules, including one that delegates class arbitrability to the arbitrator, is clear and unmistakable evidence supporting the parties' clear intent to arbitrate the issue.

No. 23-20140

## B. The Four-Month Deadline's Enforceability was for the Arbitrators.

Under the parties' agreement, the enforceability of the four-month deadline to complete arbitration was also delegated to the arbitrators.[7] The Engagement Letter states that "the arbitrator has exclusive authority to resolve all disputes and challenges to the formation and enforceability of this arbitration agreement." AAA Rule 7(a) provides that the arbitrator "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement." That rule is unambiguous, is unambiguously incorporated into the agreement, and is not even supplementary. The four-month deadline is

---

[7] Regarding both the four-month deadline and the next section discussing simultaneous arbitrations, the Feldman and Capstone Parties argue that this court must review the arbitrators' conclusions *de novo*, and that vacatur is the appropriate remedy for "an award granted by an arbitrator selected in a manner inconsistent with the arbitration agreement." *PoolRe Ins. Corp. v. Organizational Strategies, Inc.*, 783 F.3d 256, 262–64 (5th Cir. 2015) (citing *Brook v. Peak Int'l, Ltd.*, 294 F.3d 668, 672–73 (5th Cir. 2002)). Both *Brook* and *PoolRe* vacated awards by arbitrators appointed contrary to unambiguous clauses in the parties' agreements. *Brook*, 284 F.3d at 673; *PoolRe*, 783 F.3d at 264. Accordingly, these cases have been limited to evaluating "deviations from contract provisions describing the method for selecting arbitrators." *Bulko v. Morgan Stanley DW Inc.*, 450 F.3d 622, 625 (5th Cir. 2006). For instance, "we have treated arbitrator-selection cases like *PoolRe* as 'distinguishable' from arbitrator-qualifications cases." *OOGC Am., L.L.C. v. Chesapeake Expl., L.L.C.*, 975 F.3d 449, 456 (5th Cir. 2020).

Here, "we cannot say [the arbitrators'] selection violated a specific *method* of selection." *Bulko*, 450 F.3d at 625 (emphasis in original). The Feldman and Capstone Parties do not challenge the *method* by which the arbitrators were appointed, but whether more than one arbitrator could be appointed pursuant to that method and the enforceability of the four-month deadline. Neither issue is governed by the selection-method case law. To be sure, the Feldman and Capstone Parties suggest that Judge Jones was improperly appointed to replace Judge Medley, who had resigned. But the arbitration agreement expressly stated that, after the expiration of the four-month period, "any party then may file another written demand for arbitration of the dispute with another" arbitrator, "with the prior arbitrator . . . then being immediately divested of jurisdiction." This contention is meritless.

thereby governed by AAA Rule 7(a) because the Engagement Letter confirms that the four-month deadline is "jurisdictional" when it explains that if the deadline expires, "any party then may file another written demand for arbitration . . . with the prior arbitrator . . . then being immediately divested of jurisdiction." The enforceability of the four-month deadline was therefore delegated to the arbitrator under the Engagement Letter and AAA Rule 7(a).

In deciding that the four-month provision was "inconsistent with due process" and unconscionable, the arbitrators were unpersuaded by the Feldman and Capstone Parties' arguments that the four-month provision must be strictly construed. They stated: "The simple fact is that the four month period does not allow due process to be ignored. To insist on its strict compliance elevates form over substance and encourages discovery delays to run out the clock and [encourages] further arbitrations." "[T]he sole question for [this court] is whether the arbitrator[s] (even arguably) interpreted the parties' contract, not whether [they] got its meaning right or wrong." *Oxford Health Plans*, 569 U.S. at 569, 133 S. Ct. at 2067. Under this lenient standard, this court cannot upend the arbitrators' rejection of a strict interpretation of the four-month provision, and in turn its enforceability was for the arbitrators to decide.

## C. The Validity of Simultaneous Arbitrations Was for the Arbitrators.

The Engagement Letter also delegated the permissibility of simultaneous arbitrations to the arbitrators. The Engagement Letter makes clear that "[t]he arbitrator or arbitral association appointed to resolve the dispute shall have the sole and exclusive ability to rule on all aspects of the arbitrator's appointment." Neither party argues that simultaneous arbitrations pose a gateway issue presumptively reserved for courts. Accordingly, whether the Engagement Letter permitted multiple, simultaneous arbitrations is a matter of contract interpretation.

The Engagement Letter states that "either party may directly appoint the single arbitrator or the arbitral association who/which shall proceed to resolve the dispute." This provision creates a limit of one arbitrator per "dispute." The scope and meaning of "dispute" under the Engagement Letter raises an issue on which this court defers to the arbitrators if they "(even arguably) interpreted the parties' contract." *Oxford Health Plans*, 569 U.S. at 569, 133 S. Ct. at 2067. The arbitrators who concluded that multiple arbitrations could proceed simultaneously did so because they considered each arbitration to be a different "dispute" under the Engagement Letter.

While the Feldman and Capstone Parties point out that the underlying arbitrations all concern the same "dispute" with the Doctors, the arbitrators' different conclusion is not unmoored from the agreement. The Feldman and Capstone Parties also argue that the arbitrators impermissibly considered the district judge's own, earlier interpretation that simultaneous arbitrations were permissible. But that is inapposite: neither principle nor precedent suggests that arbitrators' favorable consideration of the district court's view undermines the deference owed by the courts. Further, the district court interpreted this provision only after the Feldman and Capstone Parties themselves raised it, and a "party cannot complain on appeal of errors which he himself induced the district court to commit." *United States v. Lopez-Escobar*, 920 F.2d 1241, 1246 (5th Cir. 1991).

For these reasons, we may not second-guess the arbitrators' decisions to proceed simultaneously, not to enforce the four-month provision, and to allow class arbitration.

## II. Inconsistent Arbitration Awards

All four confirmed awards differ in total amounts. Insofar as the court's judgment only reflected the largest (Jones) award, it rendered

No. 23-20140

meaningless the other three confirmed awards. This conundrum, however, may be resolved indirectly by addressing the district court's overbroad stay enjoining the parties from untangling the conflicting awards through further arbitration.

Section 10 of the FAA lists four grounds for vacating an arbitration award:

> (1) where the award was procured by corruption, fraud, or undue means;

> (2) where there was evident partiality or corruption in the arbitrators, or either of them;

> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

*See* 9 U.S.C. § 10. The grounds are "exclusive." *Citigroup Glob. Mkts., Inc. v. Bacon*, 562 F.3d 349, 352 (5th Cir. 2009) (quoting *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581, 128 S. Ct. 1396, 1401 (2008)). Inconsistency among awards, without more, is not among the exclusive grounds for judicial vacatur.[8]

---

[8] Extensive research has not shed light on precedent helpful to resolving courts' authority in the face of inconsistent awards. The Feldman and Capstone parties primarily point to two cases, which are inapposite.

In *Roughneck Concrete Drilling & Sawing Co. v. Plumbers' Pension Fund, Loc. 130, UA [United Ass'n]*, 640 F.3d 761 (7th Cir. 2011), Judge Posner opined that to enforce one

No. 23-20140

But the district court committed an error that unnecessarily led to the internally inconsistent judgment now on appeal. Specifically, the district court erred in orally applying its March 22, 2021, stay order to prohibit further arbitration to resolve the conflicting confirmed awards. After the Partial Final Judgment was entered, the parties disputed whether any of the other much lower arbitration awards has any res judicata effect on the Jones award. The possibility of post-judgment arbitration to reconcile the confirmed Jones and Glasser awards is not precisely before this court, but the continuing propriety of the stay order is. *See* FED. R. APP. P. 3(c)(4) ("The notice of appeal encompasses all orders that, for purposes of appeal, merge into the designated judgment or appealable order.").

At the time it was entered, the stay order properly enjoined the commencement of new state court and arbitral proceedings temporarily, until the awards were issued in the already-compelled arbitrations, to protect

---

award but not the other would establish that one "was ultra vires and therefore cannot be enforced." *Id.* at 768. *Roughneck* is inapposite for two reasons. First, the FAA does not apply to LMRA arbitrations. 9 U.S.C. § 1; s*ee Int'l Chem. Workers Union v. Columbia Chems. Co.*, 331 F.3d 491, 494 (5th Cir. 2003). Second, *Roughneck*'s holding was unique to its facts, which involved more than one union's arbitrations against a single employer. The *Roughneck* court opted to enforce one award over the other because the arbitrator whose award the court enforced was authorized "to determine whether there was a jurisdictional dispute," and that arbitrator concluded that the other arbitration was invalid. 640 F.3d at 769. No arbitrator here had sole authority to review the jurisdiction of the others.

And in an earlier labor case, the court held that if the inconsistent awards are each independently valid, "the reviewing court must . . . select that interpretation which most nearly conforms to the intent of the parties." *Conn. Light & Power Co. v. Loc. 420, Int'l Brotherhood of Elec. Workers, AFL-CIO*, 718 F.2d 14, 21 (2d Cir. 1983) (Winter, J.). The court enforced the award that it "believe[d] . . . to be the better reasoned decision." *Id.* at 21. In recent years, *Connecticut Light* has been described as inconsistent with the Supreme Court's precedent in *Oxford Health Plans* because it delved into the merits of the underlying controversy. *See 23andMe, Inc. v. Davis-Hudson*, No. 5:15-CV-01323-PSG, 2015 WL 6094303, at *3–4 (N.D. Cal. Oct. 16, 2015). We resist the urge to second-guess the merits of the various awards.

both those arbitrations and the district court's jurisdiction. All Writs Act, 28 U.S.C. § 1651(a). The court's opinion justifying a stay presciently explained why the stay must be discontinued now. *Sullivan v. Feldman*, No. 4:20-cv-02236 (S.D. Tex. Mar. 22, 2021) (order consolidating cases and enjoining further arbitrations). Referencing "its earlier order that multiple arbitrations could proceed" simultaneously, the district court explained that the "arbitrators are authorized to determine whether and when earlier decisions or awards have preclusive effects." *Dist. Ct. Op.*, 2022 WL 17822451, at *16. As the district court explained, "[t]he parties applied their contract to make this mess but agreed that arbitration would resolve their disputes, no matter how messy. This court will not step in to clean it up and risk making it worse." *Id.* The court recognized that the engagement Letter gave the Feldman and Capstone Parties the right to pursue arbitration to resolve any conflicting awards, with any new arbitrator "determin[ing] whether and when earlier decisions or awards have preclusive effects." *Id.*

Maintaining the stay at this juncture, however, thwarts the parties' bargain, "messy" as it is. The stay is now overbroad because "it enjoins a defendant from engaging in legal conduct." *Missouri v. Biden*, 83 F.4th 350, 395 (5th Cir. 2023). Moreover, "[i]njunctions must be narrowly tailored within the context of the substantive law at issue to address the specific relief sought." *E.T. v. Paxton*, 19 F.4th 760, 769 (5th Cir. 2021). The district court's temporary stay is no longer viable to prevent the parties, if they so choose, from exercising their contractual right to engage in further arbitration.

## III. Individual, Non-Signatory Defendant Jeff Carlson Was Not Bound to Arbitrate.

Among the four awards confirmed by the district court, only the Jones Award held Carlson individually liable to the Doctors. The other arbitrators

dismissed claims against him.[9]   The Jones award cannot be upheld as to Carlson, who was neither a party to the Engagement Letter nor subject to direct-benefits estoppel.  This court decides the identity of parties that are bound by an arbitration agreement.  *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84, 123 S. Ct. 588, 592 (2002) (citing *First Options of Chicago*, 514 U.S. at 943–46, 115 S. Ct. at 1923–25; *John Wiley & Sons, Inc.*, 376 U.S. 543, 546–47, 84 S. Ct. 909, 912–13).

## A. Carlson Is Not Bound by the Engagement Letter.

Carlson became President of Capstone Associated Services, Ltd., after the Engagement Letter was executed.  Accordingly, he was a non-signatory to the contract.  As a non-signatory, Carlson is not within the express compass of the Engagement Letter's arbitration provision.  State contract law controls "the scope of agreements (including the question of who is bound by them)."  *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630, 129 S. Ct. 1896, 1902 (2009); *see also Crawford Prof'l Drugs v. CVS Caremark Corp.*, 748 F.3d 249, 255 (5th Cir. 2014).  Under Texas law, "[o]rdinary principles of contract and agency law may be called upon to bind a nonsignatory to an [arbitration] agreement whose terms have not clearly done so."  *DK Joint Venture 1 v. Weyand*, 649 F.3d 310, 314 & n.4 (5th Cir. 2011) (quoting *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003)) (alterations in original).  Ordinarily, "defendant corporations enter[ing] into" arbitration agreements do "not cause their agents . . . who acted only as officers on behalf of the corporations, to be personally bound by those agreements."  *Id.* at 314.

---

[9] In so holding, Glasser "den[ied] any and all claims of liability lodged against Mr. Carlson as being without legal or factual support here"; Judge Baker found "that there is no factual or legal support for any claims of liability against Jeff Carlson"; and Kutcher found that "there is no basis for finding Mr. Carlson personally liable."

But the Doctors contend that direct-benefits estoppel nevertheless binds Carlson to arbitrate. Simply put, that doctrine prevents a non-signatory to a contract from seeking benefits from the contract while objecting to its arbitration provision. *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 131–33 (Tex. 2005); *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005). Consequently, if a non-signatory seeks a benefit from a contract that contains "an arbitration clause, then the nonsignatory must arbitrate all claims that fall within the scope of that arbitration clause." *Taylor Morrison of Tex., Inc. v. Ha*, 660 S.W.3d 529, 533 (Tex. 2023). "A nonsignatory can seek the benefits of a contract either by suing based on the contract, or by conduct that 'deliberately seeks and obtains substantial benefits from the contract itself.'" *Id.* (quoting *Weekley Homes*, 180 S.W.3d at 132).

Carlson invoked the Engagement Letter's arbitration provision to intervene in the Dorfman and Baker arbitrations, but only to seek his own exoneration. The issue here is whether that qualifies as a direct benefit that estops his objection to being included in the Jones arbitration. The district court confirmed the Jones award as to Carlson, but although Carlson strenuously objected to being held liable under any theory, the district court curiously failed to consider his arguments. Be that as it may, we hold that Carlson is not estopped from objecting to the Jones arbitration. Carlson only joined two arbitrations to assert defenses and did not attempt to enforce a different part of the Engagement Letter against the Doctors. No Texas cases cited by the Doctors or uncovered in our research involve comparable facts. Especially because "the boundaries of direct-benefits estoppel are not always clear," we decline to extend the doctrine to this context. *See In re Vista Ins. Grp., Inc.*, 192 S.W.3d 759, 761 (Tex. 2006).

The Doctors highlight the Texas Supreme Court's recent comment that it "ha[s] yet to specifically address whether a non-signatory claimant may likewise be required to arbitrate any related counterclaims asserted

against it in the course of compelled arbitration proceedings." *Lennar Homes of Tex. Land & Constr., Ltd. v. Whiteley*, 672 S.W.3d 367, 377 n.8 (Tex. 2023). The Doctors assert that this court must resolve the open issue. But this case does not involve "related counterclaims," because Carlson never claimed a benefit from a provision of the Engagement Letter. *See id.*

The Doctors' reliance on *Ruff v. Ruff*, No. 05-18-00326-CV, 2020 WL 4592794 (Tex. Ct. App.—Dallas 2020), is also misplaced. In *Ruff*, a non-signatory initiated an arbitration and sought a declaration that a contract validly released him from certain liability. *Id.* at *2. In other words, he initiated arbitration to get the benefit of that contract. When the opposing party brought tort counterclaims in the same arbitration, the arbitrator found the non-signatory liable for the torts. *Id.* at *2–3. Only when the arbitrator opted to adjudicate the counterclaims did the non-signatory object. *Id.* at *3. Both Carlson and the *Ruff* non-signatory were attempting to eliminate claims against them, but the fact that the contract in *Ruff* contained a release provision makes all the difference. Whereas Carlson's interventions in two earlier arbitrations did not seek a benefit from the Engagement Letter, the *Ruff* non-signatory's arbitration was principally intended to enforce a release agreement.

The Doctors invoke the equitable nature of direct-benefits estoppel, averring that Carlson's allegedly inconsistent positions as to whether he was subject to the arbitration provision support binding him to the Jones proceeding. *See, e.g.*, *Jody James Farms, JV v. Altman Grp.*, 547 S.W.3d 624, 637 (Tex. 2018). The record refutes this contention. Equity militates in favor of Carlson for at least three reasons. First, Carlson's litigation conduct was less an assertion of inconsistent positions than of alternative defenses: that he could not be bound to arbitrate, or if he could be, he was innocent. Second, if Carlson's positions were inconsistent, then so were the Doctors' positions, because they succeeded in persuading Judge Dorfman that Carlson was a

non-signatory who could not participate. *See also DK Joint Venture 1*, 649 F.3d at 318 (emphasizing, with respect to judicial estoppel, the relevance of a party's taking inconsistent positions as to whether it is bound to arbitrate).

Third, as Carlson persuasively argues, he was hardly on notice that he remained a party to the Jones arbitration until the nearly $100 million award was issued against him. Specifically, Carlson was initially a party to the Medley arbitration, but he obtained a state court order temporarily restraining that arbitrator from continuing against him. The Doctors then amended their complaint in the Medley arbitration to omit any claims against Carlson so that their arbitration could proceed. Further, when Medley was replaced by Judge Jones, the Doctors did not name Carlson in the caption or elsewhere except by incorporating earlier, since-superseded pleadings in the Medley arbitration. Because Carlson could not be bound as a non-signatory anyway, and given the convoluted nature of the subsequent proceedings, we do not reach whether Carlson was sufficiently noticed that he was a party to the Jones arbitration and whether he even *was* a party to it. Even so, we can safely conclude that the highly questionable nature of Carlson's "notice" was such that equity cannot bolster the Doctors' direct-benefits estoppel arguments.

Finally, contrary to the Doctors' argument, Carlson did not waive his objection to Judge Jones's authority because he timely objected in the Medley arbitration. Especially if all of the Doctors' claims against Carlson carried over from the Medley to the Jones arbitration, as the Doctors contend, then Carlson's objections before Judge Medley also carried over. Nor did Carlson "invite error" for essentially the same reason that direct-benefits estoppel does not apply: that Carlson appealed to arbitration defensively in the other proceedings did not "invite" Judge Jones's erroneous inclusion of him in that single award.

## B. Reversal of the Jones Award as to Carlson.

Carlson seeks vacatur of the entire Jones award because Judge Jones "exceeded [his] powers" under 9 U.S.C. § 10(a)(4) by including him. But that error only warrants modification, not vacatur. "If an [arbitrator] exceeds [his] authority, it provides grounds for a court to vacate *that aspect* of [his] decision." *Smith v. Transp. Workers Union of Am., AFL-CIO Air Transp. Local 556*, 374 F.3d 372, 375 (5th Cir. 2004) (per curiam) (emphasis added). Vacating the whole award may be warranted where the *ultra vires* action "taint[s] the entire process." *PoolRe*, 783 F.3d at 265. In *PoolRe*, this court found a "taint[ on] the entire process" where the arbitrator allowed an impermissible plaintiff to intervene, necessarily affecting the amount and form of the arbitration award. *Id.*; *see also PoolRe Ins. Corp. v. Organizational Strategies, Inc.*, H-13-1857, 2014 WL 1320188, at *19 (S.D. Tex. Mar. 31, 2014). But Carlson is a defendant, not a plaintiff, and Judge Jones held him jointly and severally liable with the Feldman and Capstone Parties. Carlson's presence had no bearing on the amount of damages suffered by the Doctors. The improper  award against Carlson did not "taint[] the entire process." *PoolRe*, 783 F.3d at 265.

## CONCLUSION

The parties remain free to arbitrate another day. For the sake of sanity, judicial efficiency, and litigation economics, this court hopes their disagreements will be finally resolved. We AFFIRM in part, REVERSE in part, VACATE in part, and REMAND. We AFFIRM the Glasser, Baker and Kutcher arbitration awards. We AFFIRM in part the Jones arbitration award but REVERSE in part insofar as the Jones award pertains to defendant Jeff Carlson. We VACATE and REMAND the district court's March 22, 2021, order staying further arbitrations between the parties.